**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
Michael W. Sobol (SBN 194857)
msobol@lchb.com
Facundo Bouzat (SBN 316957)
fbouzat@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111
Telephone:  415.956.1000
Facsimile:  415.956.1008

**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
Nicholas Diamand
ndiamand@lchb.com
Douglas I. Cuthbertson
dcuthbertson@lchb.com
Abbye R. Klamann (SBN 311112)
aklamann@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013
Telephone:  212.355.9500
Facsimile:  212.355.9592

*Attorneys for Plaintiffs individually and on*
*behalf of all others similarly situated*

**CARNEY BATES & PULLIAM, PLLC**
Hank Bates (SBN 167688)
hbates@cbplaw.com
Allen Carney
acarney@cbplaw.com
David Slade
dslade@cbplaw.com
519 West 7th St.
Little Rock, AR 72201
Telephone:  501.312.8500
Facsimile:  501.312.8505

REDACTED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO/OAKLAND DIVISION

MICHAEL MCDONALD, TAMARA
DRAUT, and DOMINIQUE MURILLO, on
behalf of themselves; and as parents and
guardians of their children, P.G.M., P.S.M.,
P.R.M., H.D.-F., M.M., G.M., and E.M.; and
on behalf of all others similarly situated,

Plaintiffs,

v.

KILOO A/S; SYBO GAMES APS;
ADCOLONY, INC.; CHARTBOOST, INC.;
FLURRY, INC.; INMOBI PTE LTD.;
IRONSOURCE USA INC.; OATH
(AMERICAS) INC. d/b/a OATH
ADVERTISING, INC.; OATH, INC.;
TAPJOY, INC.; and VUNGLE, INC.

Defendants.

Case No. 3:17-cv-4344-JD

**AMENDED CLASS ACTION**
**COMPLAINT**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................... 1

II.  PARTIES .................................................................................................................... 1

Plaintiffs ......................................................................................................................... 1

The Developer Defendants ............................................................................................. 2

The SDK Defendants ...................................................................................................... 2

III. JURISDICTION AND VENUE .............................................................................. 4

IV.  INTRADISTRICT ASSIGNMENT ......................................................................... 5

V.   ALLEGATIONS APPLICABLE TO ALL COUNTS ............................................ 5

A.   Defendants Surreptitiously Exfiltrate Children's Personal Data As They Play Subway Surfers. .......................................................................... 5

1.   The Role of Persistent Identifiers ........................................................ 8

2.   The Moment Users Launch Subway Surfers, the SDK Software in the App Sends Users' Persistent Identifiers to the SDK Defendants ........ 10

B.   The SDK Defendants Exfiltrate Users' Personal Data While They Play Subway Surfers. ................................................................................ 11

1.   Tapjoy ............................................................................................... 11

a.   Forensic Analysis of Tapjoy's Activity in Subway Surfers .......... 12

b.   Tapjoy's Contract with Kiloo ..................................................... 15

c.   Tapjoy is in the Business of Collecting Personal Data to Track and Profile Users .............................................................. 15

2.   Flurry ................................................................................................ 16

a.   Forensic Analysis of Flurry's Activity in Subway Surfers ........... 16

b.   Flurry's Contract With Kiloo ...................................................... 18

c.   Flurry is in the Business of Collecting Personal Data to Track and Profile Users .............................................................. 18

3.   Vungle .............................................................................................. 22

a.   Forensic Analysis of Vungle's Activity in Subway Surfers ......... 23

b.   Vungle's Contract With Kiloo ..................................................... 25

c.   Vungle is in the Business of Collecting Personal Data to Track and Profile Users .............................................................. 25

4.   Chartboost ........................................................................................ 26

a.   Forensic Analysis of Chartboost's Activity in Subway Surfers .................................................................................. 26

b.   Chartboost's Contract With Kiloo ............................................... 28

c.   Chartboost is in the Business of Collecting Personal Data to Track and Profile Users .......................................................... 28

5.   ironSource ........................................................................................ 28

1

**TABLE OF CONTENTS**
(continued)

2

Page

3      a.     Forensic Analysis of ironSource's Activity in Subway
              Surfers ........................................................................... 29

4      b.     ironSource's Contract With Kiloo ................................. 30

5      c.     ironSource is in the Business of Collecting Personal Data to
              Track and Profile Users ................................................ 30

6   6.    InMobi ...................................................................................... 32

7      a.     Forensic Analysis of InMobi's Activity in Subway Surfers ........ 32

8      b.     InMobi's Contract With Kiloo ...................................... 34

9      c.     InMobi is in the Business of Collecting Personal Data to
              Track and Profile Users ................................................ 34

10  7.    AdColony .................................................................................. 35

11     a.     Forensic Analysis of AdColony's Activity in Subway
              Surfers ........................................................................... 36

12     b.     AdColony's Contract With Kiloo ................................. 37

13     c.     AdColony is in the Business of Collecting Personal Data to
              Track and Profile Users ................................................ 38

14  C.  Developer Defendants' "Age Gate" Is Illusory and Does Not Protect
        Children's Privacy .......................................................................... 38

15  D.  The Privacy-Invasive and Manipulative Commercial Purposes Behind
        Defendants' Data Exfiltration, and its Effect on Child Users. ............ 39

16  1.    The Role of Persistent Identifiers in User Profiling and Targeted
              Advertising ................................................................ 39

17
18  2.    Defendants Use Children's Personal Data to Target Them, Despite
              Children's Heightened Vulnerability to Advertising ................ 43

19  3.    Defendants Exfiltrate and Analyze Users' Personal Data to Track
              the Effect of Their Ads on Users' Behavior ........................... 46

20  4.    Defendants Use Personal Data to Encourage Children to Continue
              Using the App, Increasing the Risks Associated with Heightened

21            Mobile Device Usage ..................................................... 48

22  E.  State Privacy Laws Protect Children and Their Parents from Privacy-
        Invasive Tracking, Profiling, and Targeting of Children Online. ........ 53

23  1.    Defendants' Surreptitious and Deceptive Collection of Personal
              Data Violates Plaintiffs' Reasonable Expectations of Privacy and is

24            Highly Offensive. ......................................................... 54

25  2.    Defendants Breach of Privacy Norms Is Compounded by
              Defendants' Targeting, Tracking, and Profiling of Children. ........ 60

26  F.  Kiloo's Omissions and Misrepresentations Create the False Impression
        That Subway Surfers is Compliant with Privacy Laws and Social Norms. ........ 64

27  1.    Kiloo Markets Subway Surfers as Suitable to Children, and Is
              Aware That More Than Half of Its Audience is Younger than Age

28            18. ............................................................................. 64

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4344

1

**TABLE OF CONTENTS**
(continued)

2

Page

3        2.    Kiloo Explicitly and Falsely Stated That It Does Not Track
              Children or Collect Personal Data............................................................ 67

4        3.    The SDK Defendants Violate Their Own Privacy Commitments. ........... 67

5    G.   Fraudulent Concealment and Tolling.................................................... 68

6    H.   Named Plaintiff Allegations................................................................. 68

7        1.    Plaintiff Michael McDonald and His Children, P.G.M., P.S.M., and
              P.R.M. ................................................................................................. 68

8        2.    Plaintiff Tamara Draut and Her Child, H.D.-F. ....................................... 69

9        3.    Plaintiff Dominique Murillo and Her Children, M.M., G.M., and
              E.M. ................................................................................................... 69

10   VI.   CLASS ALLEGATIONS ............................................................................... 70

11   VII.  CLAIMS FOR RELIEF ................................................................................. 74

     COUNT I Intrusion Upon Seclusion (Brought on Behalf of the Intrusion Upon Seclusion
12        Class)............................................................................................................... 74

13   COUNT II California Constitutional Right to Privacy (Brought on Behalf of the California
          Subclass of the Intrusion Upon Seclusion Class)............................................ 76

14   COUNT III Violation of N.Y. Gen. Bus. Law § 349 (Brought on Behalf of the New York
          Class)............................................................................................................... 78

15   VIII. PRAYER FOR RELIEF.................................................................................. 79

16   DEMAND FOR JURY TRIAL................................................................................ 82

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4344

1  I.    **INTRODUCTION**

2      1.    This is an action brought by parents to protect the privacy of their children.

3  Defendants acted together to take personal data from children while they play the gaming app

4  Subway Surfers on their mobile devices, and to track children's online behavior to profile them

5  for targeted advertising and other commercial exploitation. Defendants' conduct invaded the

6  reasonable expectation of privacy of the parents and their children, violating existing social norms

7  and their concomitant legal standards.  Plaintiffs bring claims under the California law of

8  Intrusion Upon Seclusion on behalf of themselves and a class of parents from thirty-five states

9  (having the same state law claim), as well as state-specific privacy claims on behalf of the

10  California Subclass and the New York Classes.  Plaintiffs seek an injunction to stop Defendants'

11  unlawful practices and sequester their unlawfully obtained information, and an award of

12  reasonable damages.

13  II.    **PARTIES**

14      **Plaintiffs**

15      2.    Plaintiffs are the parents of children who played the online gaming application or

16  app ("app") Subway Surfers, which is operated by the Defendants.

17      3.    Plaintiff Michael McDonald, and his children, "P.G.M.," "P.S.M.," and "P.R.M.,"

18  reside in Blue Lake, California.  Mr. McDonald brings this action on behalf of himself, P.G.M.,

19  P.S.M., and P.R.M., and all others similarly situated.  P.G.M., P.S.M., and P.R.M. are all minors,

20  and each played Subway Surfers on an Apple device.

21      4.    Plaintiff Tamara Draut and her child, "H.D.-F.," reside in Brooklyn, New York.

22  Ms. Draut brings this action on behalf of herself, H.D.-F, and all others similarly situated.  H.D.-F

23  is a minor, and she played Subway Surfers on an Apple device.

24      5.    Plaintiff Dominique Murillo and her children, "M.M.," "G.M.," and "E.M." reside

25  in Laguna Niguel, California.  Ms. Murillo brings this action on behalf of herself, "M.M.,"

26  "G.M.," and "E.M.," and all others similarly situated.  "M.M.," "G.M.," and "E.M." are all

27  minors, and each played Subway Surfers on an Android device.

28

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4344

1

**The Developer Defendants**

2      6.      Defendants Kiloo and Sybo (collectively, the "Developer Defendants") co-

3 developed Subway Surfers, which, since its release on May 24, 2012, has been downloaded more

4 than a billion times and played by millions of users in the United States.[1]

5      7.      Defendant Kiloo A/S ("Kiloo") is a commercial mobile game development

6 company headquartered at Klostergade 28, First Floor, 8000 Aarhus C, Copenhagen, Denmark.

7 Kiloo is responsible for developing Subway Surfers, publishing it for user download in the Apple

8 App Store and Google Play Store, and marketing it, including by working with advertisers,

9 contracting with ad networks (as defined *infra*), embedding advertisers' software into Subway

10 Surfers, and integrating social media platforms into Subway Surfers.

11      8.      Defendant Sybo Games ApS ("Sybo") is a commercial mobile game development

12 company headquartered at Jorcks Passage 1A, 4, 1162 Copenhagen K, Denmark.  On information

13 and belief, in addition to developing and marketing[2] Subway Surfers, Sybo owns the intellectual

14 property rights for Subway Surfers, and is responsible for developing the game play, graphics,

15 and in-game programming.

16      9.      ████████████████████████████████████████████████

17 ██████████████████████████████████████.[3]

18

**The SDK Defendants**

19      10.      The "SDK Defendants"—identified in paragraphs 11 through 17 below—are

20 entities which provided their own proprietary computer code to Developer Defendant Kiloo,

21 known as software development kits ("SDKs"), for installation and use in Subway Surfers.  Kiloo

22 embedded each of the SDK Defendants' SDKs into Subway Surfers, causing the transmittal of

23 

24 

25 

26 

27 

28 ────────────

[1] *See* "Subway Surfers," SensorTower, *available at* https://sensortower.com/ios/us/kiloo/app/subway-surfers/512939461/  (accessed June 4, 2018). (approximately 31% of Subway Surfers users are based in the United States).
[2] Despite Sybo's averment – contained in a declaration provided to Plaintiffs' counsel to defeat personal jurisdiction – that it does not market Subway Surfers, its website contains animated graphics of Subway Surfers, which invite consumers to "tour the world" with its characters.  That page links to another page identifying the vendors where consumers can download the game.  *See* "Subway Surfers," Sybo, *available at* https://sybogames.com/subway-surfers/ (accessed June 4, 2018).
[3] ███████████████

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4344

app users' Personal Data—including in the form of persistent identifiers—to the SDK Defendants to facilitate subsequent tracking, profiling and targeting.  As used herein, "Personal Data" is any data that refers to, is related to, or is associated with an identified or identifiable individual.

11.     SDK Defendant AdColony, Inc. ("AdColony") is an American technology company with offices throughout the world, headquartered at 11400 W. Olympic Boulevard, 12th Floor, Los Angeles, CA 90064.

12.     SDK Defendant Chartboost, Inc. ("Chartboost") is an American technology company headquartered at 85 2nd Street, Suite 100, San Francisco, CA 94105.

13.     SDK Defendant Flurry, Inc. is an American technology company headquartered at 360 3rd Street, Suite 750, San Francisco, CA 94107.  Flurry Inc. is a subsidiary of Oath (Americas) Inc. and Oath Inc., and upon information and belief, acts as a general manager of its parent companies.  Defendant Oath (Americas) Inc. does business in California as Oath Advertising Inc. and has a principal place of business at 701 First Avenue, Sunnyvale CA 94089. Defendant Oath Inc. is headquartered at 701 First Avenue, Sunnyvale, CA 94089 (Flurry, Inc., Oath (Americas) Inc., and Oath Inc., together, "Flurry").

14.     SDK Defendant InMobi Pte Ltd. ("InMobi") is a technology company with offices throughout the world.  Its headquarters are located at 30 Cecil Street # 19-08, Prudential Tower, Singapore 049712.

15.     SDK Defendant ironSource USA, Inc. ("ironSource") is an American technology company headquartered at 17 Bluxome Street, San Francisco, CA 94107.  SDK Defendant ironSource owns and operates the advertising SDK "Supersonic."

16.     SDK Defendant Tapjoy, Inc. ("Tapjoy") is an American technology company with offices throughout the world, headquartered at 111 Sutter Street, 12th Floor, San Francisco, CA 94104.

17.     SDK Defendant Vungle, Inc. ("Vungle") is an American technology company with offices throughout the world and headquarters at 185 Clara Street, San Francisco, CA 94107.

1    **III.    JURISDICTION AND VENUE**

2          18.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

3    §§ 1332 and 1367 because this is a class action in which the matter or controversy exceeds the

4    sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed

5    Classes and Subclasses are citizens of a state different from some Defendants.  Subway Surfers

6    has been downloaded more than a billion times.  Plaintiffs' good faith estimate based on

7    download statistics and demographic data is there are tens of millions of members in the Intrusion

8    Upon Seclusion Class across thirty-five states, millions of members of the California Sub-Class,

9    and millions of members of the New York Sub-Class, resulting in damages that far exceed

10   $5,000,000, exclusive of interest and costs.

11          19.      This Court has personal jurisdiction over Defendants because they purposefully

12   direct their conduct at California, transact business in California (including in this District), have

13   substantial aggregate contacts with California (including in this District), engaged and are

14   engaging in conduct that has and had a direct, substantial, reasonably foreseeable, and intended

15   effect of causing injury to persons throughout the United States, including those in California

16   (including in this District), and purposely availed themselves of the laws of California.

17   Additionally, SDK Defendants Vungle, Tapjoy, AdColony, Chartboost, ironSource, and Flurry

18   are headquartered in and/or have principal places of business in California.

19          20.      The Defendants' activities in California gave rise to and furthered the privacy

20   violations suffered by Plaintiffs.  Developer Defendant Kiloo contracted with each of the SDK

21   Defendants to exfiltrate the Personal Data of app users – including those located in California –

22   and to send that data to the SDK Defendants where it could be analyzed and monetized for

23   Defendants' financial gain, in violation of Plaintiffs' privacy expectations.  Specifically,

24   Developer Defendant Kiloo contracted with numerous SDK Defendants it knew to be located in

25   California[4] to input data-exfiltrating code into Subway Surfers. ██████████████████

26   ████████████████████████████████████████████████████████

27   ─────────────────────

28   [4] SDK Defendants AdColony, Chartboost, Flurry, ironSource, Tapjoy, and Vungle are either
     located in or have a subsidiary located in California.

1     ████████     The cooperation between each of the SDK Defendants and Developer Defendant

2     Kiloo—memorialized in these contracts— resulted in the exfiltration of Plaintiffs' children's data

3     from their devices and use for Defendants' commercial gain.

4

5

6

7

8          22.     The Developer Defendants facilitated the exfiltration and monetization of user data

9     with the SDK Defendants through key employees working for each SDK Defendant.  These

10    employee contacts were located in, and facilitated the monetization of user data from, California.

11         23.     Plaintiffs were harmed by this activity in California.

12         24.     In accordance with 28 U.S.C. § 1391, venue is proper in this district because a

13    substantial part of the conduct giving rise to Plaintiffs' claims occurred in this District,

14    Defendants transact business in this District, and because numerous Defendants reside in this

15    District.  Specifically, SDK Defendants Vungle, Tapjoy, ironSource, Flurry Inc., and Chartboost

16    are headquartered in San Francisco.

17    **IV.    <u>INTRADISTRICT ASSIGNMENT</u>**

18         25.     Pursuant to Civil L.R. 3-2(c), assignment to this Division is proper because a

19    substantial part of the conduct which gives rise to Plaintiffs' claims occurred in this District.

20    Defendants market their products throughout the United States, including in San Francisco and

21    Alameda counties.  In addition, most SDK Defendants are headquartered in or have offices in San

22    Francisco.

23    **V.    <u>ALLEGATIONS APPLICABLE TO ALL COUNTS</u>**

24         **A.    <u>Defendants Surreptitiously Exfiltrate Children's Personal Data As They Play Subway Surfers.</u>**

25

26         26.     The Developer Defendants style and promote Subway Surfers as a fun, free, kid-

27    friendly game.  The game is available for download as a mobile gaming app in online stores,

28    including Google's "Play Store" and Apple's "App Store."  As one of the most popular and

ubiquitous gaming apps, Subway Surfers has been downloaded more than a billion times worldwide.  Developer Defendant Kiloo markets Subway Surfers to a family audience that includes children.  Indeed, it is presented with an "Everyone 10+" rating in Google's Play Store and "9+" rating in Apple's App Store.  Google Play ratings "are intended to help consumers, especially parents, identify potentially objectionable content that exists within an app" and are based on the app developer's responses to questionnaires provided by Google – i.e. the ratings reflect the developer's representations about the appropriate audience for the app.[5]  An "Everyone 10+" rating means the app's content is "generally suitable for ages 10 and up" and "[m]ay contain more cartoon, fantasy or mild violence, mild language and/or minimal suggestive themes."[6]  Similarly, the Apple age ratings are based on questionnaires completed by the app developer regarding the app's content and reflect its representations about the app's suitability for children,[7] and a 9+ rating indicates that the game is suitable for users ages 9 and older.



*Figure 1*[8]

---

[5] "Play Console Help," Google, *available at* https://support.google.com/googleplay/android-developer/answer/188189?hl=en (accessed on June 4, 2018).
[6] *Id.*
[7] "App Store Review Guidelines," Apple, *available at* https://developer.apple.com/app-store/review/guidelines/ (accessed on June 4, 2018).
[8] Figure 1 is a picture of the Subway Surfers app as advertised in the Apple App Store, as of May 27, 2018.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4344

27.     Subway Surfer players embody a "youthful hooligan" graffiti artist who runs down subway tracks to avoid capture by the police.  The game encourages a player to "DASH as fast as you can! DODGE the oncoming trains! Help Jake, Tricky & Fresh escape from the grumpy Inspector and his dog. Grind trains with your cool crew! … Challenge and help your friends! Join the App Store's most daring chase!"  It advertises "[c]olorful and vivid HD graphics! Hoverboard Surfing! Paint powered jetpack! Lightning fast swipe acrobatics!"[9]

28.     Plaintiff parents or their children downloaded and installed the Subway Surfers app onto their mobile devices for the Plaintiffs' children to play.

29.     Unbeknownst to parents and their children, the Developer Defendants in partnership with the SDK Defendants collect and exfiltrate Personal Data as users play Subway Surfers.  Defendants completely fail to inform Subway Surfers users that, as they play Subway Surfers, Defendants are surreptitiously collecting the Personal Data and tracking online behavior to profile users for targeted advertising.  Users of Subway Surfers have no reasonable way to know, and Defendants fail to disclose, that when users download Subway Surfers onto their mobile devices, the SDK Defendants' data collection and advertising software is also simultaneously downloaded.  Users have no reason to identify the SDK Defendants and their policies, or the existence of them.  Even while playing Subway Surfers, users have no reasonable way to determine that advertising SDKs have been embedded on their mobile devices.

30.     As users play Subway Surfers, the SDK advertising software collects their Personal Data and without the user's knowledge or consent exfiltrates the Personal Data to sophisticated advertising companies where it is used to track and profile users for targeted advertising.

31.     Targeted advertising is driven by users' Personal Data and employs sophisticated algorithms that interpret the Personal Data to determine the most effective advertising for individual users.  Once exfiltrated to an SDK Defendant, the Personal Data harvested from users of Subway Surfers can be combined with other data associated with that same user via persistent

_____

[9] *Id.*

identifiers or by virtue of other data (e.g., online activity or demographics) which can track and identify the same user.   This is often accomplished via an ad network where additional data may be associated with the user in a similar fashion.

32.     The ad network is also where the buying and selling of advertising space takes place.  It is a virtual marketplace where app developers and advertisers buy and sell advertising space and the ads to fill it.  These networks connect advertisers looking to sell data driven, targeted ads to mobile apps that want to host advertisements.  A key function of an ad network is aggregating available ad space from developers and matching it with advertisers' demands.

33.     Using advanced, custom analytics and network analysis tools, Plaintiffs have been able to:  (1) determine which SDK entities have their software embedded into Subway Surfers; (2) record network traffic as it leaves the device, including encrypted data; (3) detect the Personal Data that Defendants access in real time and exfiltrate from users' devices; and (4) identify the SDK Defendants that received Personal Data.

### 1.     The Role of Persistent Identifiers

34.     The most common data Defendants take from users' devices and use for tracking, profiling, and targeting are called persistent identifiers.  These identifiers are a set of unique data points (typically numbers and letters), akin to a social security number, and can link one specific individual to all of the apps on her device and her activity on those apps, allowing her to be tracked over time and across devices (e.g. smart phones, tablets, laptops, desktops and smart TVs).

35.     The common persistent identifiers for Apple are the ID for Advertisers ("IDFA") and ID for Vendors ("IDFV").  Both the IDFA and the IDFV are unique, alphanumeric strings that are used to identify an individual device—and the individual who uses that device—in order to track and profile the user, and to serve her with targeted advertising.

36.     The common persistent identifiers in the Android operating system are the Android Advertising ID ("AAID") and the Android ID.  The AAID and Android ID are unique, alphanumeric strings assigned to a user's device and used by apps and third-parties to track and profile the user, and to serve her targeted advertising.

37.     A device's International Mobile Equipment Identity ("IMEI") is also a persistent identifier.  An IMEI is a fixed, unique 15-digit serial number that is used to route calls to one's phone and reflects information about the origin, model, and serial number of the device.  A device has one fixed IMEI.

38.     Additionally, each Apple and Android device can be identified by its "Device Fingerprint" data, which is another form of persistent identifier.  Device Fingerprint data include myriad individual pieces of data about a specific device, including details about its hardware— such as the device's brand (*e.g.*, Apple or Android), the type of device (*e.g.*, iPhone, Galaxy, iPad)—and details about its software, such as its operation system (*e.g.*, iOS or Android).  This data can also include more detailed information, such as the network carriers (*e.g.*, Sprint, T-Mobile, AT&T), whether it is connected to Wi-Fi, and the "name" of the device.  The name of the device is often particularly personal, as the default device name is frequently configured to include users' first and/or last names (*e.g.*, "Jane Minor's iPhone").  In combination, the pieces of data comprising the Device Fingerprint provide a level of detail about the given device that allows that device and its user to be identified individually, uniquely, and persistently—as the appellation "Fingerprint" implies.

39.     Defendants exfiltrate and analyze persistent identifiers—including a user's IDFA/IDFV (for Apple devices), Android ID/AAID (for Android devices), or Device Fingerprint data[10]—in order to learn more about users, including their behaviors, demographics, and preferences, and, thereafter, to serve them with tailored and targeted advertising.  Defendants also use persistent identifiers to track the effectiveness of those advertisements after the user sees them (to determine, for example, whether the user downloaded the app or bought the product advertised).

---

[10] There are multiple, additional items of data that are universally recognized as persistent identifiers.  For example, a device's Wi-Fi MAC address is a fixed serial number that is used to identify one's phone when transmitting and receiving data using Wi-Fi.  Plaintiffs' forensic analysis has principally focused on the exfiltration and use of IDFA/IDFV, Android ID/AAID, and Device Fingerprint data persistent identifiers.  However, as alleged herein, multiple SDK Defendants acknowledge collecting *additional* persistent identifiers.

2.      **The Moment Users Launch Subway Surfers, the SDK Software in the App Sends Users' Persistent Identifiers to the SDK Defendants.**

40.      As soon as a user opens up the Subway Surfer app on her device and it connects to the Internet—even before she begins to play the game—the app will connect to a server belonging to Kiloo (as evidenced by, for example, data being sent to servers affiliated with the address `hoodrunner.kiloo.com`) and begin sending it data.  This activity is invisible to the user, who simply sees the Subway Surfer game interface.  However, forensic analysis of the Internet communication between the device and Kiloo's servers can capture the data exchanged between the two.  An example is shown in the figure below.



*Figure 2*[11]

41.      The yellow highlighting in Figure 2, above, shows a "video ads provider list." This list identifies the entities that provide video ads through the SDKs embedded in Subway Surfers, here – as the above Figure 2 shows – those entities are the SDK Defendants AdColony, Vungle, Flurry, Tapjoy, InMobi, and Chartboost, as well as Supersonic (whose SDK is owned and operated by SDK Defendant ironSource, as alleged *supra)*.

---

[11] Potentially identifying information, including device identifiers and timestamps, have been redacted from this image to protect privacy.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4344

42.     As the user plays Subway Surfers, but invisible to the user, the embedded SDKs communicate with each of their individual servers (*e.g.*, the Flurry SDK communicates with the Flurry server).  The SDKs send requests for an ad—or "calls"—to the server.  As there are multiple SDKs embedded in Subway Surfers, multiple SKDs are contacting their servers while the user plays the game.  With each request from each SDK, the SDK also sends the user's Personal Data, including in the form of persistent identifiers.  The user may receive a single ad, but nonetheless multiple SDKs have exfiltrated to their servers the user's Personal Data.  The SDK Defendant then stores and analyzes the Personal Data to enable continued tracking of the user, such as what ads she has already seen, what actions she took in response to those ads, other online behavior, and additional demographic data.  This way, the SDK Defendants (and other entities in the ad network) can generally monitor, profile, track her over time, across devices, and across the Internet.

43.     The exfiltration of this Personal Data, the purposes for which it is used, and the lack of restrictions placed on its exfiltration, retention, and use are demonstrated through forensic testing and the contracts between Kiloo and each of the SDK Defendants.

44.     In addition to what forensic analysis reveals, Defendants each purport to collect a host of other items of Personal Data and to comingle those into expansive data profiles.

**B.    The SDK Defendants Exfiltrate Users' Personal Data While They Play Subway Surfers.**

     **1.    Tapjoy**

45.     Tapjoy is a mobile advertising company.  Tapjoy facilitates the display or "service" of ads to users playing the Subway Surfers app.  It describes itself as "maximiz[ing] mobile engagement and monetization for leading advertisers and app developers."[12]  Tapjoy claims that its "mission is to revolutionize mobile engagement and monetization. By using cutting

---

[12] "We Create Maximum Impact," Tapjoy, *available at* https://www.tapjoy.com/about/ (accessed on June 4, 2018).

edge technology, and nearly a decade of experience, [Tapjoy] helps [its] advertising and app developer partners power up their performance."[13]

46.     As SDK Defendant Tapjoy asserts:  "[i]nstead of clicking on banner ads, Tapjoy offers users virtual currency for watching video ads, subscribing to services, and downloading promoted apps.  Users can then spend that virtual currency on unlocking in-app content from publishers."[14]  Serving these ads within Subway Surfers (in exchange for virtual currency) facilitates targeting advertising to children, thereby allowing Tapjoy and its developer clients (like Kiloo and Sybo) "a way to monetise users who do not have credit cards or do not wish to spend real currency on app content."[15]

a.     **Forensic Analysis of Tapjoy's Activity in Subway Surfers**

47.     To show ads to Subway Surfers users, the Tapjoy SDK embedded in the Subway Surfers app communicates with or "makes a call" to Tapjoy servers (as evidenced by, for example, data being sent to servers affiliated with the address `connect.tapjoy.com`, `ws.tapjoyads.com, and placements.tapjoy.com`), and requests that an ad be shown to a particular user while she is playing the game.  This ad request can contain the user's persistent identifiers including, among others, her IDFA and IDFV (for Apple devices) or Android ID and AAID (for Android devices).

48.     For all Android devices, Tapjoy also can send the user's IMEI.

49.     In addition to the IDFA and IDFV, Android ID and AAID and or IMEI, Tapjoy can provide the specific device name.  That device name frequently includes a name associated with the account configured on the device (e.g., "Jane Minor's iPhone").  Tapjoy's server thereby can receive the name of the device's account-holder, whether or not she is an adult or minor, and can use that data point and others described below to determine which ads to serve her.

50.     Additionally, Tapjoy receives the IP address of the child user's device, which enables the identification of the user's location, the identification of the user's device, and cross-

---

[13] *Id.*
[14] "Powering Rewarding Mobile," MobyAffiliates, *available at*
http://www.mobyaffiliates.com/mobile-advertising-networks/tapjoy/ (accessed on June 4, 2018).
[15] *Id.*

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4344

device tracking.  An IP address is a unique number that identifies a given device, allowing it to communicate with other computers on the Internet (which have their own IP addresses).

51.    Tapjoy also receives a "timestamp," the time at which an advertising event is recorded by Tapjoy.  In the ad tech world, this data point plays a useful role.  The data point tracks time from a pre-established start date.  The timestamp tells online companies exactly when an ad is requested after the start date—measured to the second or millisecond—and thus permits a company to build a profile of when a user is active on her phone regardless of the time zone in which she resides.  Ad companies can use this data, which can be sorted to create trends of individual users, in efforts to boost user engagement, as well as attribution tracking described in Section V.D.3.

52.    Tapjoy's ad request can also disclose other valuable Device Fingerprint data that can be used to identify and target specific users with precise ads.  This information can include, *inter alia*:

> a.    The user's language;
>
> b.    The user's time zone and country;
>
> c.    The user's mobile network or carrier;
>
> d.    The screen dimensions of the user's device;
>
> e.    The user's device operating system and version;
>
> f.    Whether the user has a wireless Internet connection (Wi-Fi);
>
> g.    The manufacturer, make, and model of the user's device; and
>
> h.    The name, version, and developer of the app the user is operating.

| Data Point | Exemplar Data Field[16] | Personal Information Derived from Data |
|---|---|---|
| IDFA (Apple users) | `B3626A74-54CZ-314C-C825-C2A87669D561` | Jane Minor's device's unique IDFA |
| IDFV (Apple users) | `6Y9FDE20—8F6A-8401-93A3-F4877623A930` | Jane Minor's device's unique IDFV |
| AAID (Android users) | `A42c89c4-1dc7-5b79-92cd-` | Jane Minor's device's |

---

[16] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data. Except where indicated otherwise, data points are derived from an Apple device.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4344

| | `01fa2cd5cab2` | unique AAID |
|---|---|---|
| Android ID (Android users) | `28507917b736aa32` | Jane Minor's device's unique Android ID |
| IMEI (Android users) | `648760896327625` | Jane Minor's device's unique IMEI |
| User's device name | `personal device name: "Jane Minor's iPhone"` | Jane Minor owns this iPhone |
| User's device's IP address | `216.3.128.12` | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked across devices via this number. |
| User's language | `Accept-Language: en-US, en-us` | Jane Minor's Subway Surfers app is in American English |
| User's mobile network | `carrier name: T-Mobile` | Jane Minor's service provider is T-Mobile |
| User's time zone | `timezone: America/Los_Angeles` | Jane Minor is playing Subway Surfers while in the Pacific time zone |
| Manufacturer, make, and model of the user's device | • `device name: iPhone 6,1`<br>• `device type: iPhone` | Jane Minor is playing Subway Surfers on her Apple iPhone 6 |
| User's device operating system and version | • `platform: iOS`<br>• `os_version: 10.3.2` | Jane Minor's phone is running Apple's iOS 10.3.2. |
| User's Internet connection | `connection type: wifi` | Jane Minor's device is connected to wireless Internet |
| User's country | `country code: us` | Jane Minor is playing Subway Surfers in the US |
| Timestamp | `timestamp: 1527608937` | The Tapjoy SDK in Jane Minor's Subway Surfers app made a request to Tapjoy's servers on May 29, 2018 at 15:48:57[17] UTC.[18] |
| Screen dimensions of the user's device | • `display h: 1136`<br>• `display_d: 326`<br>• `display_w: 640` | Jane Minor's device screen is 1136 in height, 640 in width, and 326 in density |
| Application name, version, and developer | • `pkg id: com.kiloo.subwaysurfers"`<br>• `app_version: 1.0.0`<br>• `app id: 2a3298c1-9283-` | The ad request comes from a Kiloo Subway Surfer version 1.0.0 user |

[17] The timestamp is formatted to track the number of seconds since Jan. 1, 1970. By using a decoder, such as http://coderstoolbox.net/unixtimestamp, the timestamp can be converted to an exact date and time.

[18] Coordinated Universal Time.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4344

| | 487b-39cd-d183c321b384 | |
|---|---|---|

**b.**    **Tapjoy's Contract with Kiloo**[19]

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

**c.**    **Tapjoy is in the Business of Collecting Personal Data to Track and Profile Users**

54.    As alleged herein, Tapjoy is in the business of collecting Personal Data to track and profile users—including children—and sharing such Personal Data with publishers, advertisers, service providers, and Tapjoy affiliates. ████████████████████████

████████████████████████ Kiloo does not disclose to its users—nor do users have any reasonably practical way to identify—Kiloo's relationship with Tapjoy, that it embeds Tapjoy's software in Subway Surfers, or that Kiloo uses Tapjoy's services to collect and exfiltrate their Personal Data via their use of Subway Surfers.

55.    ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

[19] Redacted copies of the contracts between Kiloo and each of the SDK Defendants have been produced through discovery by counsel for the individual SDK Defendants to Plaintiffs' counsel, and are subject to the Protective Order in this Action (Dkt. No. 124). Each contract has been designated "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY" by the producing party. Accordingly, all excerpts from all contracts (and all references thereto) have been redacted in this Complaint.

[20] ████████████

[21] ██████████████████████████████████████

1 ████████████████████████████████████████████████

2 ██████████████████████████████████████████████████

3 ██████████████████████████     ████████████████████

4 ████████████████████████████████████████████████████

5 █████████████████████████████   ██████████████████████

6 ██████████████████████████████

7        **2.    Flurry**

8        56.    Flurry is a mobile and analytics advertising company working with more than

9 250,000 developers and one million apps that provides "various services to build, measure,

10 advertise, and monetize various applications."[25]  Flurry claims to "[h]elp developers and

11 marketers measure and analyze their applications in order to grow, retain, and monetize their

12 users."[26]  This includes helping developers "target [their] users" using "demographic

13 information" and their app use, among other data points.[27]

14        **a.    Forensic Analysis of Flurry's Activity in Subway Surfers**

15        57.    To show ads on Subway Surfers, the Flurry SDK embedded in the Subway Surfers

16 app communicates with Flurry's servers (as evidenced by, for example, data being sent to servers

17 with the address `ads.flurry.com`), and requests an ad to place within the Subway Surfers

18 _____



24 [25] "Company Overview of Flurry, Inc.," Bloomberg, *available at*

25 https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=25475459 (accessed on June 4, 2018).

26 [26] "Oath is Home to the Media, Tech, and Communication Brands That 1 Billion People Love and Trust. Explore Them All Here," Oath, *available at* https://www.oath.com/our-brands/ (accessed on June 4, 2018).

27 [27] "Flurry Push," Flurry, *available at* http://www.flurry.com/push.html (accessed on June 4, 2018).

28

app.  This ad request contains the user's Personal Data, including her phone or tablet's IDFA and IDFV (for Apple devices) or Android ID and AAID (for Android devices).

58.   Flurry also receives the IP address of the child user's device.

59.   Additionally, when the Subway Surfers app requests an ad from Flurry (by sending a request, for example, to servers affiliated with `ads.flurry.com`), the request contains Device Fingerprint data, which includes, *inter alia*:

  a.   The user's language;

  b.   The user's time zone and country;

  c.   The user's device operating system and version;

  d.   The manufacturer, make, and model of the user's device; and

  e.   The name and developer of the app the user is operating.

| Data Point | Exemplar Data Field[28] | Personal Information Derived from Data |
|---|---|---|
| IDFA (Apple users) | `B3626A74-54CZ-314C-C825-C2A87669D561` | Jane Minor's device's unique IDFA |
| IDFV (Apple users) | `6Y9FDE20—8F6A-8401-93A3-F4877623A930` | Jane Minor's device's unique IDFA |
| AAID (Android users) | `A42c89c4-1dc7-5b79-92cd-01fa2cd5cab2` | Jane Minor's device's unique AAID |
| Android ID (Android users) | `28507917b736aa32` | Jane Minor's device's unique Android ID |
| User's device's IP address | `216.3.128.12` | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked across devices via this number. |
| User's language | `"en-us"` | Jane Minor's Subway Surfers app is in American English |
| User's time zone | `"America/Los Angeles"` | Jane Minor is playing Subway Surfers while in the Pacific time zone |
| Manufacturer, make, and model of the user's device | `"iPhone6,1"` | Jane Minor is playing Subway Surfers on her Apple iPhone 6 |

---

[28] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data.  Except where indicated otherwise, data points are derived from an Apple device.

| User's device operating system and version | "iPhone OS 10 3 2 like Mac OS X" | Jane Minor's phone is running Apple's iOS 10.3.2. |
|---|---|---|
| User's country | "en US&America" | Jane Minor is playing Subway Surfers in English in the United States |
| Application name and developer | "com.kiloo.subwaysurfers" | The ad request comes from a Kiloo Subway Surfer user |

### b.   Flurry's Contract With Kiloo

████ ███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████

61.   ██████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████ ████████████
███████████████████████ █

### c.   Flurry is in the Business of Collecting Personal Data to Track and Profile Users

62.   As alleged herein, Flurry is in the business of collecting Personal Data to track and profile users—including children—and sharing such Personal Data with publishers, advertisers, service providers, and Flurry affiliates. ██████████████████████████
████████████████████   Kiloo does not disclose to its users—nor do users have any reasonably practical way to identify—Kiloo's relationship with Flurry, that it embeds Flurry's software in Subway Surfers, or that Kiloo uses Flurry's services to collect and exfiltrate their Personal Data via their use of Subway Surfers.

---

[29]
[30] ████████████████
[31] *Id.*

1    63.    Flurry's SDK allows developers to track various age groups, including 13- to 17-

2    year-olds.  For example, the screenshot below is taken from a free demo on Flurry's website.  It

3    shows how the Flurry SDK can segment users through demographic filters.  Below, users are

4    filtered by geographic region, gender, age, interests, and language, allowing the SDK to show

5    how many 13- to 17-year-old females who speak English and are interested in Hispanic affinity

6    are using the example app.  This information can also be broken down by geography, including to

7    the city level.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



26

27

*Figure 3*[32]

<hr>

28    [32] Figures 3 and 4 are pictures from Flurry's free demonstration of its SDK, *available at*

1

2          64.      This data can come in aggregated form about particular groups—assembled based

3   on their demographics—or it can be broken down to show the exact events a specific user took in

4   the app, as well as her age, country, location, and persistent identifier.  The below screenshot –

5   also obtained from Flurry's free SDK demonstration on its website – shows a sample "event log"

6   for a particular, hypothetical user.  It shows the user's age, precise location (by longitude and

7   latitude), and user ID,[33] as well as a log of specific actions she took within the app (such as

8   receiving a text and adding a friend) and when she did so.  This demonstrates the detail and

9   granularity that Flurry advertises it is able to ascertain about app users based on their persistent

10  identifiers.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  https://y.flurry.com/metrics/1.
    [33] On information and belief, the user ID is a unique number that Flurry assigns to users to
28  continue tracking them within the Flurry database.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4344



*Figure 4*

65.     Flurry combines the personal information described above with information received about users from third-parties, including from "third-party services … using a third-party partner (like Facebook or Twitter)," as well as user "activity on other sites and apps as well as information those third-parties provide to [the user] or [Flurry]."[34]  This tracking of users "is

---

[34] "Welcome to the Oath Privacy Center," Oath, *available at* https://policies.oath.com/us/en/oath/privacy/index.html (accessed on June 4, 2018).

performed across devices and both on and off of [Flurry's] Services, and is combined with information Flurry has about users with "information [Flurry] obtain[s] from business partners or other companies, such as [a user's] activities on other sites and apps."[35]

66.     Flurry shares information it collects from its users within its affiliated brands and with "publishers, advertisers, measurement analytics, apps, or other companies."[36]  Flurry "also share[s] information [it] ha[s] about [users] for the purposes described in this Privacy Policy, including to provide Services that [the user has] requested (including when you connect with third-party apps and widgets)."[37]

67.     Flurry even *concedes that information collected from children includes, but is not limited to,* "name, gender, birthdate, geolocation information, search queries, mobile device identifier, mobile phone number, alternative email addresses, contacts, contact information (including online contact information), nicknames and aliases, physical address, IP address, other persistent identifiers, and any other information [a] child [user] may share with [Flurry] or [Flurry's] partners, such as photos, videos or audio files that contain [a child user's] image or voice."[38]

### 3.     Vungle

68.     Vungle is a mobile advertising company that claims to "deliver the highest value users through engaging video ads" to its clients—more than 50,000 mobile apps worldwide—to help them maximize profits by delivering targeted ads:  "Advertisers depend on Vungle's creative optimization technology, targeting and HD video ad delivery to reach and acquire high-quality users worldwide."[39]

---

[35] *Id.*

[36] *Id.*

[37] "Third Parties," Oath, *available at* https://policies.oath.com/us/en/oath/privacy/topics/thirdparties/index.html (accessed on June 4, 2018).

[38] "Children's Privacy And Family Accounts," Oath, *available at* https://policies.oath.com/us/en/oath/privacy/products/family/index.html (accessed on June 4, 2018).

[39] "About Us," Vungle, *available at* https://vungle.com/about/.

69.     On its website, Vungle offers advertisers its SDK technology and markets its ability to "reach more valuable mobile consumers" by targeting consumers based on, among other information, "device type, settings, app, language, country, city and much more."[40]

a.     **Forensic Analysis of Vungle's Activity in Subway Surfers**

70.     To show an ad on the Subway Surfers app, the Vungle SDK embedded in the app requests an ad from a Vungle server (as evidenced by, for example, data being sent to servers affiliated with the address `api.vungle.com`).  This ad request contains unique personal information of the user, including her phone or tablet's IDFA (for Apple devices) or AAID (for Android devices).

71.     Vungle also receives the IP address of the child user's device.

72.     Additionally, Vungle's ad request also contains Device Fingerprint data, including, *inter alia*:

a.     The operating system and operating system version of the user's device;

b.     The manufacturer, make, and model of the user's device;

c.     The screen dimensions of the user's device;

d.     The user's language; and

e.     The name and developer of the app the user is operating.

| Data Point | Exemplar Data Field[41] | Personal Information Derived from Data |
|---|---|---|
| IDFA (Apple users) | `B3626A74-54CZ-314C-C825-C2A87669D561` | Jane Minor's device's unique IDFA |
| AAID (Android users) | `A42c89c4-1dc7-5b79-92cd-01fa2cd5cab2` | Jane Minor's device's unique AAID |
| User's device's IP address | `216.3.128.12` | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked across devices via this number. |

---

[40] "Reach More Valuable Mobile Consumers," Vungle, *available at* https://vungle.com/user-acquisition/ (accessed on June 4, 2018).

[41] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data.  Except where indicated otherwise, data points are derived from an Apple device.

| User's language | X-VUNGLE-LANGUAGE: en-US | Jane Minor's Subway Surfers app is in American English |
|---|---|---|
| Manufacturer, make, and model of the user's device | "model": "iPhone6,1" | Jane Minor is playing Subway Surfers on her Apple iPhone 6 |
| User's device operating system and version | • "platform": "iOS"<br>• "osVersion": "10.3.2" | Jane Minor's phone is running Apple's iOS 10.3.2. |
| Screen dimensions of the user's device | • "dim":<br>• "height": 1136<br>• "width": 640 | Jane Minor's screen is 1136 by 640 |
| Application name and developer | X-VUNGLE-BUNDLE-ID: com.kiloo.subwaysurfers | The ad request comes from a Kiloo Subway Surfer user |

73.     Forensic analysis has shown that Vungle can share Personal Data with other, undisclosed third-parties.  That analysis has further shown that immediately after Vungle loads an ad in Subway Surfers, the user's IDFA/AAID and other Personal Data have been transmitted from her device by Vungle, to a separate online marketing company called Adjust.  This transmission permitted Adjust to track the user's activities subsequent to viewing the ad.  In a similar instance, forensic testing has shown similar Personal Data can be transmitted to AppsFlyer, a comparable online marketing company.  The purpose of such tracking, known as "ad attribution," is to enable technology companies—here, Adjust and AppsFlyer—to track users on behalf of advertisers, observing the users' behavior over time to determine whether an ad leads a user to install the advertised app and, thus, whether a specific ad influenced behavior and was commercially profitable.[42]  Adjust and AppsFlyer, like the SDK Defendants, track and profile users through data exfiltration.  Adjust's SDK is embedded in 20,000 apps worldwide, and offers developers the ability to track in-app user behavioral patterns to increase user engagement, in addition to ad attribution.[43]  Adjust claims on its website that app developers and advertisers can "[f]ind out where users come from – whether via TV, organic, mobile web, or in-app adds," know which ads were delivered to which users, and "find out the most granular trends for user

---

[42] "Mobile App Attribution," Adjust, *available at* https://www.adjust.com/mobile-app-attribution/ (accessed on June 4, 2018).

[43] "Featured Customers," Adjust, *available at* https://www.adjust.com/customers/#featured (accessed on June 4, 2018).

1 downloads."[44]  AppsFlyer similarly provides ad attribution services, offering advertisers the

2 ability to link ads served to app installs and insight what drove each user.[45]  It also states that is

3 has "[d]eep integrations with nearly every media source and marketing platform . . . to make it

4 easy to attribute every install to its source."[46]

5 **b.    Vungle's Contract With Kiloo**

6 74.   ████████████████████████████████████████

7 ████████████████████████████ █████████████████████

8 ███████████████████████████████████████████

9 ████████████████████████████████████████

10 ██████████████████████ ███████████████████████

11 ████████████████████████████████████████

12 ████████████████████████████████████████████████

13 ██████████████████████████████.[49]

14 **c.    Vungle is in the Business of Collecting Personal Data to Track**
**and Profile Users**

15

16 75.   As alleged herein, Vungle is in the business of collecting Personal Data to track

16 and profile users—including children—and sharing such Personal Data with publishers,

17 advertisers, service providers, and Vungle affiliates. ████████████████████████

18 █████████████████████  Kiloo does not disclose to its users—nor do users have

19 any reasonably practical way to identify—Kiloo's relationship with Vungle, that it embeds

20 Vungle's software in Subway Surfers, or that Kiloo uses Vungle's services to collect and

21 exfiltrate their Personal Data via their use of Subway Surfers.

22

23 ────────────────

23 [44] Mobile App Attribution," Adjust, *available at* https://www.adjust.com/mobile-app-attribution/
24 (accessed on June 4, 2018).
25 [45] "Attribute Every Install," AppsFlyer, *available at* https://www.appsflyers.com/product/mobile-attribution/ (accessed on June 4, 2018).
26 [46] Mobile App Attribution," Adjust, *available at* https://www.adjust.com/mobile-app-attribution/
(accessed on June 4, 2018).

27 ██████████████████████████████████
28 ██ ███████████████████████████

4.      **Chartboost**

76.     Chartboost is a mobile advertising company and ad network.  Chartboost tells advertisers that it can help them "[r]each the most engaged mobile audience" by providing "direct access to over 800 million monthly active in-game players, targeting the right high value customer in the right moment."[50]  It provides ad formats to help advertisers build ads, and use its software and user data to help them "target the most relevant and valuable users" with ads.[51]  Chartboost also claims that it can "[m]onetize [developers'] player base" by providing "[a]ds tailored to [their] players."[52]  Chartboost also helps advertisers build—and developers place—rewarded video ads and pop-up ads on mobile apps.

77.     Chartboost's SDK is integrated into more than 300,000 online games.[53] Chartboost allows developers like Kiloo using its SDK to have direct access to data derived from all other Chartboost-enabled games.

a.      **Forensic Analysis of Chartboost's Activity in Subway Surfers**

78.     To load an ad, the Chartboost SDK embedded in Subway Surfers can communicate with Chartboost via its server (as evidenced by, for example, data being sent to servers affiliated with the address `live.chartboost.com`), requesting that Chartboost place an ad within the Subway Surfers app.  This ad request contains users' persistent identifiers, including the phone or tablet's IDFA and IDFV (for Apple devices) or AAID and Android ID (for Android devices).

79.     Chartboost also receives the IP address of the child user's device.

80.     Additionally, Chartboost's ad request contains Device Fingerprint data including, *inter alia*:

a.      The user's mobile network or carrier;

---

[50] "Reach the Most Engaged Mobile Audience," Chartboost, *available at* https://www.chartboost.com/advertisers/ (accessed on June 4, 2018).
[51] *Id.*
[52] "Monetize Your Player Base," Chartboost, *available at* https://www.chartboost.com/developers/  (accessed on June 4, 2018).
[53] *Id.*

b.      The user's language and country;

c.      The screen dimensions of the user's device;

d.      The manufacturer, make, and model of the user's device;

e.      The operating system of the user's device; and

f.      The name and developer of the app the user is operating.

| Data Point | Exemplar Data Field[54] | Personal Information Derived from Data |
|---|---|---|
| IDFA (Apple users) | `B3626A74-54CZ-314C-C825-C2A87669D561` | Jane Minor's device's unique IDFA |
| IDFV (Apple users) | `6Y9FDE20-8F6A-8401-93A3-F4877623A930` | Jane Minor's device's unique IDFV |
| AAID (Android users) | `A42c89c4-1dc7-5b79-92cd-01fa2cd5cab2` | Jane Minor's device's unique AAID |
| Android ID (Android users) | `28507917b736aa32` | Jane Minor's device's unique Android ID |
| User's device's IP address | `216.3.128.12` | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked across devices via this number. |
| User's mobile network | `"carrier-name": "T-Mobile"` | Jane Minor is a T-Mobile customer |
| User's language | `"language": "en-us"` | Jane Minor's Subway Surfers app is in American English |
| Manufacturer, make, and model of the user's device | `"device type": "iPhone 6,1"` | Jane Minor is playing Subway Surfers on her Apple iPhone 6 |
| User's device operating system and version | `"os": "10.3.2"` | Jane Minor's phone is running Apple's iOS 10.3.2. |
| Screen dimensions of the user's device | • `"device dimensions": "height": 568`<br>• `"width": 320` | Jane Minor's screen is 568 by 320 |
| User's country | `"country": "US"` | Jane Minor is playing Subway Surfers in the US |
| Application name and developer | `"bundle ID": "com.kiloo.subwaysurfers"` | The ad request comes from a Kiloo Subway Surfer user |

---

[54] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data.  Except where indicated otherwise, data points are derived from an Apple device.

1

2          **b.      Chartboost's Contract With Kiloo**

81.    ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████ █████████████████████████

████████████████████████████████████

████████████ █████████████████████████

████████████████████████████████████

██████████████[57]

          **c.      Chartboost is in the Business of Collecting Personal Data to
                    Track and Profile Users**

82.    As alleged herein, Chartboost is in the business of collecting Personal Data to

track and profile users—including children—and sharing such Personal Data with publishers,

advertisers, service providers, and Chartboost affiliates. ████████████████████

███████████████████████    Kiloo does not disclose to its users—nor do

users have any reasonably practical way to identify—Kiloo's relationship with Chartboost, that it

embeds Chartboost's software in Subway Surfers, or that Kiloo uses Chartboost's services to

collect and exfiltrate their Personal Data via their use of Subway Surfers.

          **5.      ironSource**

83.    ironSource is a mobile advertising company that helps developers "turn their

digital content into viable businesses without having to charge for them."[58]  In other words, it

helps developers who want to offer free apps make money through advertising revenue.

ironSource does this by using data to target potential app customers (it calls this "multi-

_____

██
████████████

[57] *Id.*

[58] "We're all-in Players," ironSource, *available at* https://www.ironsrc.com/about/ (accessed on
June 4, 2018).

touchpoint data targeting") and by providing ads for placement inside the app, telling developers

it can provide "every kind of ad out there to make sure [they] can pull from the widest possible

range and build the right experience for each user."

### a. Forensic Analysis of ironSource's Activity in Subway Surfers

84. To load an ad, the ironSource SDK embedded in Subway Surfers communicates

with ironSource via its server (as evidenced by, for example, data being sent to servers affiliated

with the address `outcome.supersonicads.com`), requesting that ironSource place an ad

within the Subway Surfers app. This ad request contains users' persistent identifiers, including

the phone or tablet's IDFA and IDFV (for Apple devices) or AAID (for Android devices).

85. ironSource also receives the IP address of the child user's device.

86. In addition to the IDFA and IDFV/AAID, ironSource's request contains Device

Fingerprint data including, *inter alia*:

    a. The user's mobile network or carrier;

    b. The manufacturer, make, and model of the user's device;

    c. The operating system of the user's device; and

    d. The name and developer of the app the user is operating.

| Data Point | Exemplar Data Field[59] | Personal Information Derived from Data |
|---|---|---|
| IDFA (Apple users) | `B3626A74-54CZ-314C-C825-C2A87669D561` | Jane Minor's device's unique IDFA |
| IDFV (Apple users) | `6Y9FDE20-8F6A-8401-93A3-F4877623A930` | Jane Minor's device's unique IDFV |
| AAID (Android users) | `A42c89c4-1dc7-5b79-92cd-01fa2cd5cab2` | Jane Minor's device's unique AAID |
| User's device's IP address | `216.3.128.12` | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked |

---

[59] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data. Except where indicated otherwise, data points are derived from an Android device.

| | | across devices via this number. |
|---|---|---|
| User's mobile network | `"mobileCarrier": "T-Mobile"` | Jane Minor is a T-Mobile customer |
| Manufacturer, make, and model of the user's device | • `"deviceOEM": "LGE"`<br>• `"deviceModel" : "AOSP on Bullhead"` | Jane Minor is playing Subway Surfers on her LGE Nexus[60] phone |
| User's device operating system and version | `"osVersion": "23(6.0.1)"` | Jane Minor's phone is running Android operating system version 6.0.1. |
| Application name and developer | `"bundleID": "com.kiloo.subwaysurfers"` | The ad request comes from a Kiloo Subway Surfer user |

**b.      ironSource's Contract With Kiloo**

87. ████████████████████████████████████
███████████████████     ████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████     ██     ████████████████████
███████████████████████████████████████
███████████████████     ██████████████████████████
████████████████████████

**c.      ironSource is in the Business of Collecting Personal Data to Track and Profile Users**

88.      As alleged herein, ironSource is in the business of collecting Personal Data to track and profile users—including children—and sharing such Personal Data with publishers, advertisers, service providers, and ironSource affiliates. ████████████████████████

████████████████████████████████████     Kiloo does not disclose to its users—nor do

---

[60] "Bullhead" refers to LG's Nexus cell phone.  *See, e.g.*, "Report: "Bullhead" and "Angler" are Your New Nexus Devices Made by LG and Huawei," droidlife (May 25, 2016), *available at* https://www.droid-life.com/2015/05/26/report-bullhead-and-angler-are-your-new-nexus-devices-made-by-lg-and-huawei/ (accessed on June 4, 2018).

████████████████████████████
██████████████████████████████████
██

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4344

users have any reasonably practical way to identify—Kiloo's relationship with ironSource, that it embeds ironSource's software in Subway Surfers, or that Kiloo uses ironSource's services to collect and exfiltrate their Personal Data via their use of Subway Surfers.

89.     ironSource selects and places ads based on specific user data; ironSource states that "users are unique, and each will respond to a different mix of ad units," including rewarded video ads displayed in Subway Surfers.[65]  ironSource is able to obtain this data through its large digital footprint.  Indeed, ironSource claims that it serves three billion ads every month to nearly 1 billion users.[66]

90.     ironSource aggregates the information it collects through its SDK with information provided by publishers or developers, that said publishers and developers "may [have] separately collected" about the user, and further acknowledges sharing *this* bundled information with advertisers, developers, and publishers.[67]

91.     ironSource also helps apps make money off of their current users by using player data and providing "user-level insight and ad engagement intelligence to fully understand how [app] users are being monetized."[68]  ironSource's SDK allows developers to target individual users, based on demographics derived from their data, in specific locations for specific results, as shown in Figure 5 below.  This figure demonstrates how advertisers can select a particular demographic – *e.g.*, a female between ages 25 and 30 – and select a specific action they would like her to take – *e.g.*, make an in-game purchase, install an app, or get to a certain level on an app – and a geographic location.  The ironSource SDK can use all of the data it has collected to find users that its algorithms determine best fit that description, live in that area, and are likely to be influenced to take that action, and serve an ad to those users through the ironSource SDK.

---

[65] "Monetization Never Looked So Good," ironSource, *available at* https://www.ironsrc.com/for-developers/ad-units/ (accessed on June 4, 2018).

[66] "Welcome to the New Primetime," ironSource, *available at* https://www.ironsrc.com/for-advertisers/brand-awareness/ (accessed on June 4, 2018).

[67] "ironSource Mobile Privacy Policy," ironSource, https://web.archive.org/web/20170927162013/https://developers.ironsource-mobile/android/ironsource-mobile-privacy-policy/ (accessed on June 4, 2018).

[68] "Drive maximum revenue with minimum effort," ironSource, *available at* https://www.ironsrc.com/for-developers/mediation/ (accessed on June 4, 2018).



*Figure 5*[69]

### 6.      InMobi

92.      InMobi is a mobile advertising company.  On its website, InMobi claims that its advertising platform helps brands "engage mobile users across different stages of their lifecycle" by "turn[ing] every mobile moment into an opportunity to drive user engagement and uplift [return on advertising spending] and monetization."[70]  InMobi offers businesses the ability to target those users who are most likely to respond to a particular commercial ad through targeted advertising.

#### a.      Forensic Analysis of InMobi's Activity in Subway Surfers

93.      To load an ad, the InMobi SDK embedded in Subway Surfers communicates with InMobi via it server (as evidenced by, for example, data being sent to servers affiliated with the address `sdktm.w.inmobi.com`), requesting that InMobi place an ad within the Subway Surfers app.  This ad request contains users' persistent identifiers, including the phone or tablet's IDFA and IDFV (for Apple devices) or AAID (for Android devices).

94.      InMobi also receives the IP address of the child user's device.

---

[69] Figure available at https://www.ironsrc.com/for-advertisers/user-acquisition/ (accessed June 4, 2018).
[70] "Aerserv + InMobi," InMobi, *available at* https://www.inmobi.com/ (accessed on June 4, 2018).

95. Additionally, InMobi's the ad request contains Device Fingerprint data including, *inter alia*:

      a.    The user's country and language;

      b.    The user's device screen size;

      c.    The manufacturer, make, and model of the user's device;

      d.    The operating system of the user's device; and

      e.    The name and developer of the app the user is operating.

| Data Point | Exemplar Data Field[71] | Personal Information Derived from Data |
|---|---|---|
| IDFA (Apple users) | `B3626A74-54CZ-314C-C825-C2A87669D561` | Jane Minor's device's unique IDFA |
| IDFV (Apple users) | `6Y9FDE20-8F6A-8401-93A3-F4877623A930` | Jane Minor's device's unique IDFV |
| AAID (Android users) | `A42c89c4-1dc7-5b79-92cd-01fa2cd5cab2` | Jane Minor's device's unique AAID |
| User's device's IP address | `216.3.128.12` | Jane Minor's device can be identified and located on the Internet, her location can be identified, and she can be tracked across devices via this number. |
| User's country and language | `"localization" = "en US"` | Jane Minor is playing Subway Surfers in English in the United States |
| User's device screen size | `"d-device-screen-size" : "320x568"` | Jane Minor's screen dimensions are 320 by 568 |
| Manufacturer, make, and model of the user's device | `"User-Agent" : "AOSP on Bullhead"` | Jane Minor is playing Subway Surfers on her LGE Nexus phone |
| User's device operating system and version | `"User-Agent" : "Android (6.0.1)"` | Jane Minor's phone is running Android operating system version 6.0.1. |
| Application name and developer | `"app": "com.kiloo.subwaysurfers"` | The ad request comes from a Kiloo Subway Surfer user |

---

[71] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data.  Except where indicated otherwise, data points are derived from an Android device.

b.      InMobi's Contract With Kiloo

96.      ████████████████████████████████████████

██   ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

c.      InMobi is in the Business of Collecting Personal Data to Track and Profile Users.

97.      As alleged herein, InMobi is in the business of collecting Personal Data to track and profile users—including children—and sharing such Personal Data with publishers, advertisers, service providers, and InMobi affiliates. ████████████████████████ ████████████████████████ Kiloo does not disclose to its users—nor do users have any reasonably practical way to identify—Kiloo's relationship with InMobi, that it embeds InMobi's software in Subway Surfers, or that Kiloo uses InMobi's services to collect and exfiltrate their Personal Data via their use of Subway Surfers

98.      According to its website, InMobi "combine[s] first, second, and third party data to create a holistic user graph, laying the foundation for the advanced targeting capabilities we offer."[75]  InMobi's targeting advertising capabilities include promoting an app to users "based on their app interests" and "target[ing] users based on demographics, location, context, behavior & interest" to reach the most relevant users.[76]  InMobi can also collect location data, with which it claims it can "target their [brands'] audiences beyond just latitude or longitude. With 100% control on 1st party location data collected through our in-app SDK, we leverage verified location

---

██ ████████████████████████████████████████████
██ ████████████████████████████████
██ ████████████████████████████████████

[75] "Acquire Quality Users Efficiently and Drive App Installs at Scale," InMobi, *available at* https://www.inmobi.com/advertisers/user-acquisition/ (accessed on June 4, 2018).
[76] *Id.*

signals to deliver the best geo-targeted campaigns."[77]  InMobi "translate[s] [latitude/longitude] data into known places of interest: airport, supermarkets, banks & more."[78]  However, InMobi faced a regulatory enforcement action as a result of these location-tracking practices.[79]

### 7.  AdColony

99.  AdColony is a "mobile video ad network and monetization solution."[80]  As an ad network, AdColony works with both app developers and brands seeking to place video ads on apps to generate revenue through this advertising.[81]  AdColony claims it will connect advertisers to "top trending mobile environments where consumer attention lives" using a "combination of data, tech [and] creativity."[82]  As for app developers like Kiloo, AdColony states that it will provide access to the "world's top mobile publishers" to fill their ad space, including through a variety of video ads.[83]  AdColony also facilitates rewarded video ads, wherein users "watch a video ad and are rewarded with virtual currency."[84]  Often, app developers are both developers

---

[77] "Precision Targeting for Higher User Quality," InMobi, *available at* https://www.inmobi.com/products/targeting (accessed on June 4, 2018).
[78] *Id.*
[79] InMobi entered a consent decree in June 2016 with the Federal Trade Commission, to settle claims for violation of the Federal Trade Commission Act and COPPA, as a result of its tracking technology.  The FTC alleged that InMobi tracked the locations of hundreds of millions of consumers, including children, without consent.  The consent decree required InMobi to, inter alia, obtain affirmative express consent before collecting consumer's location information.  In relation to the consent decree, the Director of the FTC's Bureau of Consumer Protection stated, "This settlement ensures that InMobi will honor consumers' privacy choices in the future, and will be held accountable for keeping their privacy promises." https://www.ftc.gov/news-events/press-releases/2016/06/mobile-advertising-network-inmobi-settles-ftc-charges-it-tracked.
[80] "About AdColony," AdColony, *available at* http://support.adcolony.com/customer/en/portal/articles/313633-about-adcolony (accessed on June 4, 2018).
[81] *Id.*
[82] "Highest Quality Mobile Experiences: Reaching an Audience of 1.4 Billion Engaged Mobile Users," AdColony, *available at* https://www.adcolony.com/advertisers/ (accessed on June 4, 2018).
[83] "Grow With Us - Maximizing App Economies for Today's Top Mobile Publishers," AdColony, *available at* https://www.adcolony.com/publishers/ (accessed on June 4, 2018).
[84] "About AdColony," AdColony, *available at* http://support.adcolony.com/customer/en/portal/articles/313633-about-adcolony (accessed on June 4, 2018).

1   and advertisers: they want to fill ad space in their apps, but also advertise their app in other

2   mobile apps.[85]  AdColony offers a platform for them to do so.

3       100.    AdColony's SDK has been embedded in more than 200 apps, and downloaded

4   more than 40 million times.[86]  It reaches an estimated 1.4 billion users.[87]

5                  **a.    Forensic Analysis of AdColony's Activity in Subway Surfers**

6       101.    To load an ad on Subway Surfers, the AdColony SDK makes a call to an

7   AdColony server (as evidenced by, for example, data being sent to servers affiliated with the

8   address `isoads24.adcolony.com`), requesting to place an ad within the app, on a particular

9   user's device.  This ad request includes the user's persistent identifiers, including the phone or

10  tablet's IDFA (for Apple devices) or AAID (for Android devices).

11      102.    AdColony also receives the IP address of the child user's device.

12      103.    Additionally, AdColony's ad request contains Device Fingerprint data, including,

13  *inter alia*:

14          a.    The user's language;

15          b.    The user's mobile network or carrier;

16          c.    The operating system and operating system version of the user's device;

17          d.    Whether the user has a wireless Internet connection (Wi-Fi);

18          e.    The manufacturer, make, and model of the user's device;

19          f.    The screen dimensions of the user's device; and

20          g.    The name and developer of the app the user is operating.

21

| Data Point | Exemplar Data Field[88] | Personal Information Derived from Data |
|---|---|---|
| IDFA (Apple users) | B3626A74-54CZ-314C-C825-C2A87669D561 | Jane Minor's device's unique IDFA |
| AAID (Android users) | A42c89c4-1dc7-5b79-92cd- | Jane Minor's device's |

---

[85] *Id.*

[86] *Id.*

[87] "Highest Quality Mobile Experiences - Reaching an Audience of 1.4 Billion Engaged Mobile Users," AdColony, https://www.adcolony.com/advertisers/ (accessed on June 4, 2018).

[88] The figures in this table are exemplars and, to protect the Plaintiffs' privacy, do not disclose their Personal Data.  Except where indicated otherwise, data points are derived from an Apple device.

| | 01fa2cd5cab2 | unique AAID |
|---|---|---|
| User's device's IP address | 216.3.128.12 | Jane Minor's device can be identified and located on the Internet through this number |
| User's mobile network | "carrier: T-Mobile" | Jane Minor is a T-Mobile customer |
| User's language | "ln: en-US" | Jane Minor's Subway Surfers app is in American English |
| Manufacturer, make, and model of the user's device | • "device brand: apple"<br>• "device_model: iPhone 6,1"<br>• "device type: phone" | Jane Minor is playing Subway Surfers on an Apple iPhone 6 |
| Screen dimensions of the user's device | • "screen width: 640"<br>• "screen height: 1136" | Jane Minor's device screen is 640 by 1136 |
| User's device operating system and version | • "os name: ios"<br>• "os_version: 10.3.2" | Jane Minor's phone is running Apple's iOS 10.3.2. |
| User's country | "locale: English (United States)" | Jane Minor is playing Subway Surfers in the US |
| Internet connection | • "network speed: wifi"<br>• "network type: wifi" | Jane Minor's device is connected to Wi-Fi |
| Application name and developer | "bundle ID": "com.kiloo.subwaysurfers" | The ad request comes from a Kiloo Subway Surfer user |

b.    **AdColony's Contract With Kiloo**



105.

c. **AdColony is in the Business of Collecting Personal Data to Track and Profile Users**

106. As alleged herein, AdColony is in the business of collecting Personal Data to track and profile users—including children—and sharing such Personal Data with publishers, advertisers, service providers, and AdColony affiliates. ██████████████████ ██████████████████████████████ Kiloo does not disclose to its users—nor do users have any reasonably practical way to identify—Kiloo's relationship with AdColony, that it embeds AdColony's software in Subway Surfers, or that Kiloo uses AdColony's services to collect and exfiltrate their Personal Data via their use of Subway Surfers.

**C. Developer Defendants' "Age Gate" Is Illusory and Does Not Protect Children's Privacy.**

107. Defendants' belated and facile implementation of age verification or age gating to identify child users of Subway Surfers is illusory and does not protect children's privacy.

108. Not until June 2017 did the Developer Defendants implement what amounts to only a nominal attempt to obtain age verification to the Subway Surfers' start screen. The Developer Defendants' age gating does no more than simply prompt users to input their year of birth before accessing an app. The Developer Defendants' age gating depends exclusively on the reliability of the user's inputted data. It fails to require any method to verify a majority age, explain the purpose behind requiring a user to provide their age, or contain any advisory message that minors should not themselves download the app. As such, the Developer Defendants' age gating can be easily circumvented with uninformed and inaccurate self-reporting, and therefore fails to adhere to minimal standards of best practices.

109. Forensic analysis of Subway Surfers reveals that the Developer Defendants' nominal age gating has no material impact on the exfiltration of Personal Data by many of the SDK Defendants, including Flurry, Vungle, Chartboost, and InMobi. The presence of the Developer Defendants' age gate heightens the invasiveness of the app and increases the potential for the exfiltration of child users' Personal Data, because the mere presence of the age gate

1    implies that Kiloo will abide by social norms that require parental consent before conducting

2    business with a minor.

3        **D.**    <u>**The Privacy-Invasive and Manipulative Commercial Purposes Behind**</u>

4    <u>**Defendants' Data Exfiltration, and its Effect on Child Users.**</u>

5              **1.**    **The Role of Persistent Identifiers in User Profiling and Targeted Advertising**

6        110.    The Developer Defendants and the SDK Defendants, in coordination, collect and

7    use the Personal Data described above to track, profile, and target children with targeted

8    advertising.

9        111.    When children are tracked over time and across the Internet, various activities are

10    linked to a unique and persistent identifier to construct a profile of the user of a given mobile

11    device.  Viewed in isolation, a persistent identifier is merely a string of numbers uniquely

12    identifying a user, but when linked to other data points about the same user, such as app usage,

13    geographic location (including likely domicile), and Internet navigation, it discloses a personal

14    profile that can be exploited in a commercial context.

15        112.    Defendants aggregate this data, and also buy it from and sell it to other third-

16    parties, all the while amassing more data points on users to build ever-expanding profiles for

17    enhanced targeting.  Across the burgeoning online advertising ecosystem – often referred to as the

18    "mobile digital marketplace" – multiple ad networks or other third-parties can buy and sell data,

19    exchanging databases amongst themselves, creating an increasingly sophisticated profile of how,

20    when, and why a child uses her mobile device, along with all of the demographic and

21    psychographic inferences that can be drawn therefrom.

22        113.    The Federal Trade Commission (the "FTC") provides an illustration of these

23    precise identifiers being used to amass a data profile, via an SDK embedded within an app.  In its

24    2012 report entitled "Mobile Apps for Kids:  Disclosures Still Not Making the Grade," (the "FTC

25    Mobile Apps for Kids Report") addressing privacy dangers for children in the app space, the FTC

26    cited forensic analysis in which:

27            [O]ne ad network received information from 31 different apps. Two
        of these apps transmitted geolocation to the ad network along with a

28            device identifier, and the other 29 apps *transmitted other data (such*

*as app name, device configuration details, and the time and duration of use) in conjunction with a device ID. The ad network could thus link the geolocation information obtained through the two apps to all the other data collected through the other 29 apps by matching the unique, persistent device ID.*[92]

114.    The FTC expressed particular "[c]oncerns about creations of detailed profiles based on device IDs [such as those created and facilitated by Defendants]…where…companies (like ad networks and analytics providers) collect IDs and other user information through a vast network of mobile apps.  This practice can allow information gleaned about a user through one app to be linked to information gleaned about the same user through other apps."[93]

115.    Defendants traffic in the same data identified by the FTC (persistent identifiers such as IDFA/AAID and Device Fingerprint data)[94] causing the same harm identified by the FTC: allowing ad networks to combine data points about child users from a multitude of apps.

116.    The FTC Mobile Apps for Kids Report cautions that it is standard practice—and long has been standard practice—for ad networks, mobile advertisers, and ad middlemen (including, for example, Defendants and their partners and agents) to link the persistent identifiers they acquire with *additional* Personal Data—such as name, address, email address—allowing those entities and their partners to identify individual users whom they profile with indisputable, individual specificity.[95]

---

[92] Federal Trade Commission, "Mobile Apps for Kids: Disclosures Still Not Making the Grade," FTC Staff Report (Dec. 2012), at 10 n. 25 (emphasis added) (citing David Norris, Cracking the Cookie Conundrum with Device ID, AdMonsters (Feb. 14, 2012), *available at* http://www.admonsters.com/blog/cracking-cookie-conundrum-device-id (accessed on June 4, 2018) ("Device ID technology is the ideal solution to the problem of remembering what a user has seen and what actions he or she has taken: over time, between devices and across domains. . . . *Device ID can also help businesses understand visitor behavior across devices belonging to the same person or the same residence.*") (emphasis added).

[93] Federal Trade Commission, "Mobile Apps for Kids: Disclosures Still Not Making the Grade." FTC Staff Report (Dec. 2012), at 9.

[94] *See, e.g.,* ¶¶ 45-55 (demonstrating that Tapjoy transmits, *inter alia,* IDFA/IDFV/AAID/Android ID and Device Fingerprint data when serving targeted ads to child users); ¶¶ 56-67 (demonstrating same for Flurry); ¶¶ 68-75 (demonstrating same for Vungle); ¶¶ 76-82 (demonstrating same for Chartboost); ¶¶ 83-91 (demonstrating same for ironSource); ¶¶ 92-98 (demonstrating same for InMobi); ¶¶ 99-109 (demonstrating same for AdColony).

[95] Federal Trade Commission, "Mobile Apps for Kids: Disclosures Still Not Making the Grade." FTC Staff Report (Dec. 2012), at 10 n. 25 (citing Jennifer Valentino-DeVries, *Privacy Risk Found on Cellphone Games, Digits Blog*, Wall St. J. (Sept. 19, 2011), *available at*

---

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4344

117.   Indeed, key digital privacy and consumer groups have described why and how a persistent identifier alone facilitates targeted advertising and challenges – effectively rendering meaningless – any claims of "anonymized" identifiers:

> With the increasing use of new tracking and targeting techniques, any meaningful distinctions between personal and so-called non-personal information have disappeared.  This is particularly the case with the proliferation of personal digital devices such as smart phones and Internet-enabled game consoles, which are increasingly associated with individual users, rather than families.  This means that marketers do not need to know the name, address, or email of a user in order to identify, target and contact that particular user.[96]

118.   A 2014 report by the Senate Committee on Homeland Security and Governmental Affairs entitled "Online Advertising and Hidden Hazards to Consumer Security and Data Privacy" amplifies this concern in light of the growth of third-party trackers that operate behind the scenes in routine online traffic:

> Although consumers are becoming increasingly vigilant about safeguarding the information they share on the Internet, many are less informed about the plethora of information created about them by online companies as they travel the Internet. *A consumer may be aware, for example, that a search engine provider may use the search terms the consumer enters in order to select an advertisement targeted to his interests. Consumers are less aware, however, of the true scale of the data being collected about their online activity*. A visit to an online news site may trigger interactions with hundreds of other parties that may be collecting information on the consumer as he travels the web. The Subcommittee found, *for example, a trip to a popular tabloid news website triggered a user interaction with some 352 other web servers as well....The sheer volume of such activity makes it difficult for even the most vigilant consumer to control the data being collected or protect against its malicious use*.[97]

---

http://blogs.wsj.com/digits/2011/09/19/privacy-risk-found-on-cellphone-games/ (noting how app developers and mobile ad networks often use device IDs to keep track of user accounts and store them along with more sensitive information like name, location, e-mail address or social-networking data)).

[96] Comments of the Center for Digital Democracy, et al., FTC, *In the Matter of Children's Online Privacy Protection Rule* at 13-14 (Dec. 23, 2011).

[97] Staff Report, "Online Advertising and Hidden Hazards to Consumer Security and Data Privacy," Permanent Subcommittee on Investigations of the U.S. Senate Homeland Security and Governmental Affairs Committee (May 15, 2014), at 1 (emphasis added).

119.    A 2012 chart of the mobile digital marketplace,[98] attached hereto as Exhibit 1,

indicates that hundreds of intermediaries from location trackers to data aggregators to ad

networks (and including multiple SDK Defendants in this litigation) "touch" the data that is used

to track and profile an individual in a given online transaction.

120.    By 2017, the number of unique companies in this space swelled to almost 5,000, as

shown in Exhibit 2, attached hereto.[99]

121.    In the course of disclosing Personal Data to select and serve an advertisement (or

to conduct any third-party analytics or otherwise monetize user data), the developer and its

partner SDKs pass identifying user data to an ever-increasing host of third-parties, who, in turn,

may pass along that same data to *their* affiliates.  Each entity may use that data to track users over

time and across the Internet, on a multitude of increasingly complex online pathways, with the

shared goal of targeting users with advertisements.

122.    The ability to serve targeted advertisements to (or to otherwise profile) a specific

user no longer turns upon obtaining the kinds of data with which most consumers are familiar

(name, email addresses, etc.), but instead on the surreptitious collection of persistent identifiers,

which are used in conjunction with other data points to build robust online profiles.  These

persistent identifiers are better tracking tools than traditional identifiers because they are unique

to each individual, making them more akin to a social security number.  Once a persistent

identifier is sent "into the marketplace," it is exposed to—and thereafter may be collected and

used by—an almost innumerable set of third-parties.

123.    Permitting technology companies to obtain children's persistent identifiers exposes

those children to targeted advertising.  The ad networks, informed by the surreptitious collection

---

[98] Laura Stampler, "This RIDICULOUS Graphic Shows How Messy Mobile Marketing Is Right
Now," Business Insider (May 23, 2012) (*available at* http://www.businessinsider.com/this-
ridiculous-graphic-shows-how-the-insanely-complicated-world-of-mobile-marketing-works-
2012-5) (accessed on June 4, 2018).
[99] Scott Brinker, "Marketing Technology Landscape Supergraphic" Chief Marketing Technology
Blog (May 10, 2017) (*available at* https://chiefmartec.com/2017/05/marketing-technology-
landscape-supergraphic-2017/) (accessed on June 4, 2018).

of Personal Data from children, will assist in the sale of advertising placed within the gaming apps and targeted specifically to children.

124.    Defendants exfiltrate children's personal information or other information about their online behavior, which is then sold to third-parties, as established above in Section V.B., who track multiple data points associated with a user's personal identifier, analyzed with the sophisticated algorithms of Big Data to create a user profile, and then used to serve targeted advertising to children whose profiles fit a set of demographic and behavioral traits.

### 2.    Defendants Use Children's Personal Data to Target Them, Despite Children's Heightened Vulnerability to Advertising

125.    Defendants use Subway Surfer users' Personal Data to serve them targeted advertising.  Defendants engage in this behavior despite the known risks associated with and ethical norms surrounding advertising to children.[100]

126.    Advertisers regard children to be valuable advertising targets.[101]  Children influence the buying patterns of their families—an influence that amounts to billions of dollars each year—and have lucrative spending power themselves.[102]  Children and teens are thus prime targets for advertisers.

127.    Kiloo intentionally profits from embedding advertising SDKs, to collect and exploit children's Personal Data, into its "free-to-play" mobile game, Subway Surfers.  For example, on March 30, 2012, Kiloo's Chief Creative Officer Simon Moeller wrote a blog post titled "How to make $3,000 per day from advertising in your free-to-play game."[103]  In it, he

---

[100]  Kristien Daems, Patrick De Pelsmacker & Ingrid Moons, *Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors*, J. of Marketing Communications (2017) at 13 ("In general, all advertising professionals acknowledge that children are a vulnerable advertising target group.").

[101] Lara Spiteri Cornish, *'Mum, can I play on the Internet?' Parents' understanding, perception, and responses to online advertising designed for children*, 33 Int'l J. Advertising 437, 438 (2014) ("Indeed, in recent years, marketers targeting children have developed a strong online presence . . ."); Issie Lapowsky, "Why Teens are the Most Elusive and Valuable Customers in Tech," Inc., *available at* https://www.inc.com/issie-lapowsky/inside-massive-tech-land-grab-teenagers.html (accessed on June 4, 2018).

[102] Sandra L. Calvert, *Children as Consumers: Advertising and Marketing*, 18 Future Child 205, 207 (2008).

[103] Simon Moller, "How to Make $3,000 Per Day from Advertising in Your Free-to-Play Game,"

wrote: "At 100k-250k DAU [Daily Active Users] you will probably be able to average anywhere between 500$ and 3000$ a day depending on active campaigns if you use ChartBoost and AdColony. Possibly more with Flurry Video as backup if AdColony runs out of inventory."[104]

128.    Defendants target advertising efforts at children despite widespread awareness that children are more vulnerable to deception by advertisers because they are easily influenced by its content, lack the cognitive skills to understand the intention of advertisers, and can struggle to distinguish between advertisements and other content.[105]  This is particularly problematic when targeted advertising is used which, by design, more effectively sways target audiences.[106] Research supports that online advertisements pose heightened risks to children.[107]

129.    Exposure to advertising can also lead to negative outcomes for children, including increasing conflict with their parents, cynicism, health issues, and increased materialism.[108]

130.    Children often lack the skills and knowledge necessary to assess and appreciate the risks associated with online data exfiltration and tracking.[109]  Even attempts to disclose privacy-violative behavior are not easily understood.  Research has found that policies explaining the exfiltration and use of children's data are difficult even for adults to understand, and marketers make no effort to explain their targeted marketing practices to child and teen audiences in developmentally appropriate and easy-to-understand ways.[110]  This practice "could mislead these

---

Games Brief (March 30, 2012), *available at* http://www.gamesbrief.com/2012/03/how-to-make-3000-per-day-from-advertising-in-your-free-to-play-game/ (accessed on June 4, 2018).

[104] *Id.*

[105] *Online Advertising on Popular Children's Websites: Structural Features and Privacy Issues*, *infra* at 143, at 1510 (collecting studies); *Children as Consumers: Advertising and Marketing*, *supra* at 102; *Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors*, *infra* at 169, at 2 (collecting studies); *'Mum, can I play on the internet?'*, *supra* at 101, at 438-39 (collecting studies).

[106] Olesya Venger, *Internet Research in Online Environments for Children: Readability of Privacy and Terms of Use Policies; The Uses of (Non)Personal Data by Online Environments and Third-Party Advertisers*, 10 Journal of Virtual Worlds Research 1, 8 (2017).

[107] *'Mum, can I play on the Internet?'*, *supra* at 101, at 440-42 (collecting studies).

[108] *Children as Consumers: Advertising and Marketing*, *supra* at 102, at 118-119.

[109] Ilene R. Berson & Michael J. Berson, *Children and their Digital Dossiers: Lessons in Privacy Rights in the Digital Age*, 21 Int'l J. of Social Education 135 (2006).

[110] *Internet Research in Online Environments for Children*, *supra* at 106, at 9.

1   vulnerable emerging consumers into thinking that they are only playing games and their data are

2   not collected for any purpose."[111]

3       131.   Defendants utilize at least two types of in-game advertising in Subway Surfers:

4   rewarded videos and pop-up ads.  The rewarded ads encourage users to watch video ads to gain

5   in-app currency, which can later be used to upgrade or advance game play.  Subway Surfers

6   allows its users to watch ads for in-game currency (i.e. play "rewarded videos") and/or to buy the

7   in-game currency with real dollars.  On the Subway Surfers home screen, an icon in the top right

8   corner leads to the rewarded videos.  When a user taps the button, an ad—in the form of a

9   video—begins to play.  The user cannot exit the ad until the video is complete (unless she closes

10  the app altogether).  When the ad is done playing, the user is rewarded with "keys."  These keys

11  are in-app currency which can then be used during game play.  They permit a user to continue

12  playing even when the central game character has been "captured," which avoids the need to re-

13  start the game from the beginning.

14      132.   Rewarded videos are touted by the SDK Defendants as helping hook users to the

15  apps, and as generating increased revenue for developers.[112]  By design, these ads cannot be

16  exited until the video ad is complete.  Users' Personal Data is exfiltrated while the ad is played.

17  Subway Surfers also features pop-up ads between game plays.

18      133.   These ads are targeted at specific users[113] based on complex profiles assembled

19  using their persistent identifiers, and other information bundled with those identifiers and sent to

20  ───────────────

21  [111] *Internet Research in Online Environments for Children*, *supra* at 106, at 10.

22  [112] *See, e.g.*, AdColony,,"New Case Study – Rewarded Video: Revenue Enhancer or IAP
    Cannibal?," AdColony Blog (Oct. 17, 2017), *available at*
    https://www.adcolony.com/advertisers/brand-advertisers/) (accessed on June 4, 2018) (marketing

23  that rewarded video ads increased session times by 28%); ironSource, "Monetize your app with
    rewarded video ads," ironSource, *available at* https://www.ironsrc.com/rewarded-video-

24  monetization/ (accessed on June 4, 2018); "Tapjoy Study Finds the More Ads an App User
    Completes, the Higher their Engagement, Retention and Spend Metrics Soar," Medium (Apr. 17,

25  2018), *available at* https://medium.com/tapjoy/the-more-ads-an-app-user-completes-the-higher-
    their-engagement-retention-and-spend-metrics-soar-fc0754c57e43 (accessed on June 4, 2018);

26  InMobi, "Everything You Need to Know About Mobile Video Ads" (Sep. 27, 2016), *available at*
    https://www.inmobi.com/insights/download/webinars/mobile-video-ads-everything-a-developer-

27  needs-to-know/ (accessed on June 4, 2018).
    [113] *See, e.g.*, "Monetization never looked so good," ironSource, *available at*

28  https://www.ironsrc.com/for-developers/ad-units/) (accessed on June 4, 2018) (ironSource's

1    the SDK Defendants pursuant to the SDK coding inputted into the app and downloaded onto

2    users' devices.

3            **3.      Defendants Exfiltrate and Analyze Users' Personal Data to Track the
              Effect of Their Ads on Users' Behavior**

4

5    134.    Defendants exfiltrate and analyze users' Personal Data before and after serving

6    advertisements.  On the front end, the data helps them know what ads to serve (based on users'

7    demographics and behaviors).  On the back end, the data helps them determine whether the ad is

8    successful in affecting children's behavior.  This is called ad attribution.

9    135.    Defendants track the impact and value of rewarded videos and other ads by

10   tracking users' activities across the Internet after they interact with those ads.  As SDK Defendant

11   AdColony admits, "[a]dvertisers are constantly on the other end of ads monitoring spend,

12   performance, and other statistics."[114]

13   136.    SDK Defendants want to reward advertisers whose ads influenced child users'

14   behavior.  But such attribution requires surveillance.  For example, if 10-year-old Sally is served

15   an ad for a pony game based on her age, implied income, and online activities, and later goes and

16   downloads that pony game, the advertiser responsible for the pony game ad wants that download

17   attributed to them, so that they can get paid for that action.  But the only way for the advertising

18   companies to connect the Sally that saw the ad with the Sally that downloaded the app is to track

19   Sally's online activities after she was shown through the app—such as by tracking her persistent

20   identifier.

21   137.    The SDK Defendants market their ability to offer ad attribution services through

22   their SDKs.  For example:

23            a.      AdColony claims that its SDK can accomplish ad attribution even when

24   users have turned on the "limit ad tracking" ("LAT") function on their phone by tracking the

25   _____

26   states that "users are unique, and each will respond to a different mix of ad units" and that its
     "SDK provides [developers] with every kind of ad out there to make sure [developers] can pull
     from the widest possible range and build the right experience for *each user*" (emphasis added)).

27   [114] "Rewarded Video – Making the Most of Value Exchange," AdColony Blog  (Aug, 12, 2016),
     *available at*  https://www.adcolony.com/blog/2016/08/12/rewarded-video-making-the-most-of-
     value-exchange/ (accessed on June 4, 2018).

28

user's Device Fingerprint data instead and "coordinating with top tracking partners to ensure continuity for users that have LAT enabled."[115]

b.      Similarly, Flurry's SDK is advertised as allowing for ad attribution, even where users have attempted to limit ad tracking.[116]  Flurry's dashboard allows developers to see how users reacted to various ad campaigns, and the actions users took in response to advertisements and in-app events.

c.      Chartboost markets that it can attribute a user's action to her exposure to an ad, even when the user does not click on the ad (*e.g.*, Jane Minor saw an ad for Subway Surfers, did not click on the ad, but went to the App Store and downloaded Subway Surfers nonetheless). Chartboost's attribution services "account[s] for installs from players who saw [the] ad, didn't click, but converted."[117]

d.      ironSource recognizes that "the success of mobile advertising rests on knowing whether the user made the download after they saw the ad" and mobile advertising companies have "developed clever ways of figuring out if the user who clicked on the ad is indeed the same user who downloaded and opened the app."[118]  ironSource markets its ability to attribute action back to users, whether or not they click on an ad encouraging that action.[119] InMobi markets its ability to do the same by partnering with other ad networks.[120]

---

[115] "Preparing for iOS 10: Ad Tracking Updates & ATS Compliance," AdColony Blog (Sep. 13, 2016), *available at* https://www.adcolony.com/blog/2016/09/13/preparing-ios-10-ad-tracking-updates-ats-compliance/ (accessed on June 4, 2018).

[116] Mallory Russell, "Flurry Releases Ad Analytics Tool To Measure Mobile Campaign," AdAge (June 12, 2012), *available at* http://adage.com/article/digital/flurry-releases-ad-analytics-tool-measure-mobile-campaigns/235316/ (accessed on June 4, 2018).

[117] "Increase Install Conversion by up to 20% With View-Through Attribution," Chartboost Blog, *available at* https://www.chartboost.com/blog/2016/08/increase-install-conversion-20-percent-view-through-attribution/ (accessed on June 4, 2018).

[118] Daniel Rosenberg, "What the Hell is Mobile Attribution," ironSource Blog, Jan. 14, 2016, *available at* https://www.ironsrc.com/news/what-is-mobile-attribution-and-how-will-it-change-in-2016/ (accessed on June 4, 2018).

[119] "View-Through Attribution," ironSource Glossary, Mar. 12, 2018, *available at* https://www.ironsrc.com/glossary/view-through-attribution/ (accessed on June 4, 2018).

[120] Rajesh Pantina, "View-Through Attribution: Shifting Gears in Performance Marketing," InMobi Blog, Aug. 24, 2016, *available at* https://www.inmobi.com/blog/2016/08/24/view-through-attribution-shifting-gears-in-performance-marketing (accessed on June 4, 2018).

138.     Defendants exfiltrate Plaintiffs' Personal Data from their devices in order to target them for advertising based on their behavior, demographics, and location.  Defendants continue to track Plaintiffs via their Personal Data after ads are shown in order to monitor their behavior into the future, and analyze whether and how it was influenced by those same targeted ads.  This ongoing exfiltration, tracking, and analysis violate Plaintiffs' privacy and exploit their vulnerabilities as children.

### 4.     Defendants Use Personal Data to Encourage Children to Continue Using the App, Increasing the Risks Associated with Heightened Mobile Device Usage

139.     Defendants, and third-party advertisers, benefit from increased mobile device usage among children.  The longer and more often a child plays Defendants' games, the more Personal Data about that child the Defendants can exfiltrate and commercialize.  As the app is free, this increased opportunity to exfiltrate and monetize children's Personal Data and expose them to advertising is critically important to Defendants.[121]

140.     The mobile advertising ecosystem does not simply benefit from increases in app use and mobile device addiction, it actively feeds it.  Defendants and their advertising partners use user data to program their apps to "hook" users, and to keep them playing the App.[122]  A key service marketed by the SDK Defendants is their ability to use marketing to retain App users, i.e., to keep users playing an App.  For example, SDK Defendant ironSource states that "[a]s users get deeper into the game or app, they become progressively more addicted to it."[123]  Likewise, SDK Defendant AdColony calls high user retention "one of the holy grails of mobile app developers."[124]  The SDK Defendants market their ability to help app developers such as the Developer Defendants increase user retention, and thereby their profits.

---

[121] "Your phone is trying to control your life," PBS News Hour, *available at* https://www.youtube.com/watch?v=MacJ4p0vITM (accessed on June 4, 2018).
[122] "Brain Hacking," *infra* at 151; Glow Kids, *infra* at 149, at XVIII-XIX, 22, 32.
[123] Jasmine Cohen, "Top Tips for Improving Mobile App Retention," ironSource blog, Feb. 22, 2017, *available at* https://www.ironsrc.com/news/mobile-app-retention-best-practices/ (accessed on June 4, 2018).
[124] "Mobile Monday: Retaining Users & App Overload," AdColony Blog, Apr. 9, 2018, *available at* https://www.adcolony.com/blog/2018/04/09/mobile-monday-4-9/ (accessed on June 4, 2018).

141.    SDK Defendants specifically target child users as part of this goal.  In an article entitled "Industry Insider Roundtable: Mobile Game Player Retention Best Practices," focused on "the latest trends and hottest topics" for acquiring and retaining users, Defendant Chartboost quotes app developers who emphasize appealing to child users:

> Ultimately, what you're looking for is for people to feel like the game is their game, and that the game is an extension of their identity. When you see a 10-year-old boy walk up to another boy, ask "What do you play?" and get back "I play Clash Royale," that's when you know you've gotten commitment.[125]

142.    The SDK Defendants' retention services are fueled by user data.  To enhance retention, the SDK Defendants use users' Personal Data to analyze their demographics and behavior, and trigger events—both within the App and across the Internet—that will encourage them to play the App more often and for longer periods.  For example:

    a.    SDK Defendant ironSource admits that it uses "retention marketing through the use of *demographic and behavioral targeting*"[126] and encourages segmentation as a way to increase retention.[127]  This segmentation is accomplished through in-depth mining of users' Personal Data.  ironSource describes it as a "process of dividing an app's user base into groups based on their behaviors and demographics—such as age, country, gender, paying or non-paying, app version, level, in-app purchases, and more."[128]

    b.    SDK Defendant InMobi suggests that developers conduct a "deep dive into [the developers'] in-app user data to measure and optimize for maximizing retention."[129]

---

[125] "Industry Insider Roundtable: Mobile Game Player Retention Best Practices," Chartboost, *available at*  https://www.chartboost.com/blog/2017/02/industry-insider-roundtable-mobile-game-player-retention-best-practices/ (accessed on June 4, 2018).

[126] Eugine Dychko, "3 Tips for Increasing App Retention (What is Retention Marketing?)," ironSource Blog, Jan. 27, 2016, *available at* https://www.ironsrc.com/news/retention-marketing-how-to-awaken-your-dormant-users/ (accessed on June 4, 2018) (emphasis added).

[127] "App Retention Rate," ironSource Glossary, Jan. 15, 2018, *available at* https://www.ironsrc.com/glossary/app-retention-rate/ (accessed on June 4, 2018).

[128] "User Segmentation," ironSource Glossary, Jan. 14, 2018, *available at* https://www.ironsrc.com/glossary/user-segmentation/ (accessed on June 4, 2018).

[129] "Boost Retention on Mobile and Keep Users Coming Back for More!," InMobi, *available at* https://www.inmobi.com/insights/download/webinars/boost-retention-on-mobile-and-keep-users-coming-back-for-more/ (accessed on June 4, 2018).

c.      SDK Defendant AdColony markets its ability to "segment users for re-engagement campaigns" based on information gleaned from their data.[130]

d.      SDK Defendant Chartboost alerts developers that "[t]he data [a developer's] game collects is a powerful tool if harnessed properly."[131]  Chartboost encourages users to use data collected by its SDK to "understand more about [the developer's] existing players' habits inside your games" and then "[t]arget specific player segments who have previously installed the game and by device list for higher retention, re-engagement and/or monetization."[132]

e.      SDK Defendant Tapjoy markets its ability to identify and retain individual users based on their current and future spending within the app.[133]

143.    Defendants exfiltrate Subway Surfer users' Personal Data—including Plaintiffs' Personal Data—from their devices and use it for tracking and targeting to entice users to play the App longer and more often.  Defendants use sophisticated algorithms to determine whether and when to target users with specific in-App cues or out-of-App ads.  This behavior increases Defendants' revenue, all the while violating Plaintiffs' privacy and exposing them to the negative outcomes associated with increased mobile device usage by children.

144.    Defendants' "retention" efforts take place in a context where mobile device usage among children is widespread and growing.  As of 2017, 95% of families with children younger

---

[130] "The First 30 Days: How Session Frequency Affects Retention," February 2, 2017, AdColony Blog, *available at* https://www.adcolony.com/blog/2016/02/02/the-first-30-days-how-session-frequency-affects-retention/ (accessed on June 4, 2018).

[131] Nate Barker, "The Mobile Dev's Ultimate Guide to Segmentation," Chartboost Blog, *available at* https://www.chartboost.com/blog/2015/09/ultimate-guide-to-segmentation/ (accessed on June 4, 2018).

[132] "Track Maximize Communicate," Chartboost Blog, *available at* https://www.chartboost.com/blog/2014/06/track-maximize-communicate/ (accessed on June 4, 2018); *see also* Nate Barker, "The Mobile Dev's Ultimate Guide to Segmentation," Chartboost, *available at* https://www.chartboost.com/blog/2015/09/ultimate-guide-to-segmentation/ (accessed on June 4, 2018) (suggesting that developers use the Chartboost SDK to "harness knowledge about their players and then divide them into groups" in order to "target[] [them] with different ads in order to help them purchase or re-engage with [the] game.").

[133] Tapjoy, Introducing Tapjoy's Marketing Automation and Monetization Platform, YouTube, *available at* https://www.youtube.com/watch?v=leRajK6bROo (accessed on June 4, 2018).

than 8-years-old had a smartphone, and 78% had a tablet.[134]  The proportion of homes with a tablet has nearly doubled over the past four years.[135]  Often, children have their own devices; as of 2017, 45% of children younger than 8-years-old had their own mobile device, up from only 3% in 2011 and 12% in 2013.[136]

145.     Children spend increasingly more time on mobile devices.  On average, a child younger than 8-years-old spends 48 minutes every day on a mobile device, more than four times the average time spent in 2013,[137] while children between the ages of eight and twelve spend 141 minutes on mobile devices and teens spend 252 minutes.[138]  Mobile games are popular among children, second only to watching TV or videos.[139]  Children younger than 8-years-old spend an average of 16 minutes every day gaming, more than doubling since 2013.[140]  Twenty-seven percent of children ages 8 to 18 report playing mobile games every day,[141] and those who play games average about 70 minutes *every day* doing so.[142]

146.     As the use of mobile devices rises, so too do awareness of and concern about the effects of this use on children.[143]  The consequences of mobile device overuse, particularly among

---

[134] Victoria Rideout, The Common Sense Census: Media Use By Kids Age Zero To Eight, Common Sense Media (2017) at 3, *available at* https://www.commonsensemedia.org/research/the-common-sense-census-media-use-by-kids-age-zero-to-eight-2017 (accessed on June 4, 2018).

[135] Media Use By Kids Age Zero To Eight, *supra* at 134, at 23

[136] *Id.*

[137] *Id.* at 3

[138] Victoria Rideout, "The Common Sense Census: Media Use by Tweens and Teens," Common Sense Media (2015) at 21, *available at* https://www.commonsensemedia.org/research/the-common-sense-census-media-use-by-tweens-and-teens (accessed on June 4, 2018).

[139] Media Use By Kids Age Zero To Eight, *supra* at n.134, at 23

[140] *Id.* at 31

[141] Media Use by Tweens and Teens, *supra* at n.138, at 15

[142] *Id.* at 24

[143] *See, e.g.*, Xiaomei Cai and Xiaoquan Zhao, Online Advertising on Popular Children's Websites: Structural Features and Privacy Issues, 29 Computers in Human Behavior 1510-1518 (2013); Barry Rosenstein and Anne Sheehan, "Open letter from JANA Partners and CALSTRS to Apple Inc.," Jan. 6, 2018, *available at* https://thinkdifferentlyaboutkids.com/index.php?acc=1 (accessed June 4, 2018) (letter to Apple citing "growing body of evidence" that increasing mobile device use leads to "unintentional negative consequences" for young users)

1  children, is well-known in the tech industry,[144] with many industry leaders refusing to allow their

2  own children to own or use devices,[145] or attend schools where such devices are prevalent.

3       147.    In a recent study, forty percent of parents of 5- to 8-year-olds reported difficulty

4  getting their children to turn off mobile devices.[146] 53% percent of teens and 72% of kids age 8-

5  12 report conversations with their parents about how much time they spend on mobile devices.[147]

6  Parents are increasingly concerned about their children's mobile device usage, and for good

7  reason: research has associated increasing usage with negative consequences for children,[148] such

8  as increasing rates of ADHD,[149] depression,[150] anxiety,[151] and reduced focus in the classroom.[152]

9  One recent study showed that children between the ages of 12 and 18 who spent more time

10 playing games had lower average social-emotional well-being.[153]

11      148.    Most parents prefer that children are better off spending less time on their mobile

12 devices.[154] Three out of four parents are worried about their children's use of screen devices.[155]

---

[144] *See, e.g.*, Farhad Majoo, "It's Time for Apple to Build a Less Addictive iPhone," New York Times, Jan. 17, 2018, *available at* https://www.nytimes.com/2018/01/17/technology/apple-addiction-iphone.html (accessed on June 4, 2018) ("Tech 'addiction' is a topic of rising national concern."); Thuy Ong, "Sean Parker on Facebook: 'God only knows what it's doing to our children's brains'," The Verge, Nov. 9, 2017, *available at* https://www.theverge.com/2017/11/9/16627724/sean-parker-facebook-childrens-brains-feedback-loop (accessed on June 4, 2018) (former tech industry leader recognizing that app creators intentionally "exploit[] human vulnerabilities" to increase app engagement).

[145] Nick Bilton, "Steve Jobs Was a Low-Tech Parent," New York Times, September 10, 2014, *available at* https://www.nytimes.com/2014/09/11/fashion/steve-jobs-apple-was-a-low-tech-parent.html (accessed on June 4, 2018); Claudia Dreifus, "Why We Can't Look Away From Our Screens," New York Times, March 6, 2017, *available at* https://www.nytimes.com/2017/03/06/science/technology-addiction-irresistible-by-adam-alter.html (accessed on June 4, 2018).

[146] Media Use By Kids Age Zero To Eight, *supra* at 134, at 41

[147] Media Use by Tweens and Teens, *supra* at 138, at 71

[148] Ryan M. Atwood et al., Adolescent Problematic Digital Behaviors Associated with Mobile Devices, 19 North American J.Psychology 659-60 (2017) (collecting studies); *Id.* at 672-73 (finding that more than 82.5% of teens were classified as over-users of the Internet, and finding that mobile device usage increased Internet usage).

[149] Nicholas Kardaras, Glow Kids 123-124 (2016)

[150] *Id.* at 127

[151] *Id.*; 60 Minutes, "Brain Hacking," *available at* https://www.youtube.com/watch?v=awAMTQZmvPE (accessed on June 4, 2018).

[152] Glow Kids, *supra* at 149, at 123

[153] Media Use by Tweens and Teens, *supra* at 138, at 79

[154] Media Use By Kids Age Zero To Eight, *supra* at 134, at 39

[155] *I* at 42

1    A recent study showed that 67% of parents of children under age 8 worry about companies

2    collecting data about their children through media, while 69% are concerned about too much

3    advertising.[156]

4    **E.    State Privacy Laws Protect Children and Their Parents from Privacy-
            Invasive Tracking, Profiling, and Targeting of Children Online.**

5

6           149.    "Invasion of privacy has been recognized as a common law tort for over a century.

7    *Matera v. Google Inc*., 15-CV-0402, 2016 WL 5339806, at *10 (N.D. Cal, Sept. 23, 2016) (citing

8    Restatement (Second) of Torts §§ 652A-I for the proposition "that the right to privacy was first

9    accepted by an American court in 1905, and 'a right to privacy is now recognized in the great

10   majority of the American jurisdictions that have considered the question'"). *Id.*  As Justice

11   Brandeis explained in his seminal article, *The Right to Privacy*, "[t]he common law secures to

12   each individual the right of determining, ordinarily, to what extent his thoughts, sentiments, and

13   emotions shall be communicated to others."  Samuel D. Warren & Louis Brandeis, *The Right to

14   Privacy*, 4 HARV. L. REV. 193, 198 (1890).  The Second Restatement of Torts recognizes the

15   same privacy rights through its tort of intrusion upon seclusion, explaining that "[o]ne who

16   intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his

17   private affairs or concerns, is subject to liability to the other for invasion of his privacy."

18   Restatement (Second) of Torts § 652B (1977).  The Supreme Court has similarly recognized the

19   primacy of privacy rights, explaining that the Constitution operates in the shadow of a "right to

20   privacy older than the Bill of Rights."  *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965).  For

21   its part, California amended its constitution in 1972 to specifically enumerate a right to privacy in

22   its very first section.  *See* Cal. Const. Art. I, § 1.  And the California Supreme Court has

23   recognized the fundamental injuries at stake in privacy violations, explaining as follows:

24              [A] measure of personal isolation and personal control over the
                conditions of its abandonment is of the very essence of personal
25              freedom and dignity . . . A [person] . . . whose conversations may
                be overhead at the will of another . . . is less of a [person], has less
26              human dignity, on that account. He who may intrude upon another
                at will is the master of the other and, in fact, intrusion is a primary
27

─────────────────────
28   [156] *Id.*

weapon of the tyrant.

*Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 231 (1998) (quoting Edward J. Bloustein,

*Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser*, 39 N.Y.U. L. REV. 962,

973-74 (1964)); *see also Gill v. Curtis Pub. Co.*, 38 Cal. 2d 273, 276 (1952) ("Recognition has

been given of a right to privacy, independent of the common rights to property, contract,

reputation and physical integrity... In short, it is the right to be let alone.") (internal quotation

marks omitted).

        **1.**    **Defendants' Surreptitious and Deceptive Collection of Personal Data Violates Plaintiffs' Reasonable Expectations of Privacy and is Highly Offensive.**

150.    A reasonable person believes the conduct described above violates Plaintiffs'

expectations of privacy.

151.    A survey conducted by the Center for Digital Democracy ("CDD") and Common

Sense Media of more than 2,000 adults found overwhelming support for the basic principles of

privacy embedded in state common law, as well as federal law.[157]   The parents who were polled

responded as follows when asked whether they agreed or disagreed with the following statements:

      a.    "It is okay for advertisers to track and keep a record of a child's behavior

online if they give the child free content."

        • 5 percent strongly agree
        • 3 percent somewhat agree
        • 15 percent somewhat disagree
        **• 75 percent strongly disagree**
        • 3 percent do not know or refused to answer

      b.    "As long as advertisers don't know a child's name and address, it is okay

for them to collect and use information about the child's activity online."

        • 3 percent strongly agree
        • 17 percent somewhat agree
        • 10 percent somewhat disagree
        **• 69 percent strongly disagree**

---

[157] Center for Digital Democracy, "Survey on Children and Online Privacy, Summary of Methods and Findings," *available at* http://www.centerfordigitaldemocracy.org/sites/default/files/COPPA%20Executive%20Summary%20and%20Findings.pdf.

1          • 1 percent do not know or refused to answer

2          c.      "It is okay for advertisers to collect information about a child's location

3    from that child's mobile phone."

4                   • 6 percent strongly agree
                     • 3 percent somewhat agree
5                   • 7 percent somewhat disagree
                     • **84 percent strongly disagree**
6                   • less than 1 percent do not know or refused to answer

7          d.      "Before advertisers put tracking software on a child's computer, advertisers

8    should receive the parent's permission."

9                   • **89 percent strongly agree**
                     • 5 percent somewhat agree
10                  • 2 percent somewhat disagree
                     • 4 percent strongly disagree
11                  • less than 1 percent do not know or refused to answer

12         e.      When asked, "There is a federal law that says that online sites and

13   companies need to ask parents' permission before they collect personal information from children

14   under age 13. Do you think the law is a good idea or a bad idea?" 93 percent said it was a good

15   idea, 6 percent said it was a bad idea, and 1 percent did not know or refused to answer.

16         f.      Non-parent adults tended to answer in the same way, although parents were

17   more protective of their children's privacy.

18         152.    In a 2013 primer designed for parents and kids to understand their privacy rights

19   online, the CDD noted similar findings:[158]

20         a.      91% of both parents and adults believe it is not okay for advertisers to

21   collect information about a child's location from that child's mobile phone.

22         b.      96% of parents and 94% of adults expressed disapproval when asked if it is

23   "okay OK [sic] for a website to ask children for personal information about their friends."

24         c.      94% of parents, as well as 91% of adults, believe that advertisers should

25   receive the parent's permission before putting tracking software on a child's computer.

26

27   ---
[158] *See* Center for Digital Democracy, "The New Children's Online Privacy Rules: What Parents
     Need to Know," 6 (June 2013),
28   https://www.democraticmedia.org/sites/default/files/CDDCOPPAParentguideJune2013.pdf.

153.     In a Pew Research Center study, nearly 800 Internet and smartphone users were asked the question, "how much do you care that only you and those you authorize should have access to information about where you are located when you use the Internet?" 54% of adult Internet users responded "very important," 16% responded "somewhat important," and 26% responded "not too important."[159]

154.     According to the same study, "86% of Internet users have tried to be anonymous online and taken at least one step to try to mask their behavior or avoid being tracked." For example, 64% percent of adults claim to clear their cookies and browser histories in an attempt to be less visible online.

155.     Smartphone owners are especially active when it comes to these behaviors. Some 50% of smartphone owners have cleared their phone's browsing or search history, while 30% have turned off the location tracking feature on their phone due to concerns over who might access that information.[160] Such behaviors exemplify people's expectation that their personal information—including their location—not be tracked by others online.

156.     In another study by the Pew Research Center on the Internet and American Life, respondents were asked, "Which of the following statements comes closest to exactly how you, personally, feel about targeted advertising being used online—even if neither is exactly right?" 68 percent said, "I'm not okay with it because I don't like having my online behavior tracked and analyzed." 28 percent said, "I'm okay with it because it means I see ads and get information about things I'm really interested in."[161] Thus, more often than not, attitudes toward data collection for use in targeted advertising are negative.

---

[159] Lee Rainie, et al., *Anonymity, Privacy, and Security Online*, Pew Research Center 7, Sept. 5, 2013, *available at* http://pewinternet.org/Reports/2013/Anonymity-online.aspx (accessed June 4, 2018).

[160] Jan Lauren Boyles, et al., *Privacy and Data Management on Mobile Devices*, Pew Research Center, Sept. 5, 2012, *available at* http://www.pewinternet.org/files/old-media//Files/Reports/2012/PIP_MobilePrivacyManagement.pdf (accessed June 4, 2018).

[161] Kristen Purcell, et al., *Search Engine Use*, Pew Research Center 2012, *available at* http://www.pewinternet.org/files/old-media/Files/Reports/2012/PIP_Search_Engine_Use_2012.pdf (accessed June 4, 2018).

157.    A survey of 802 parents and their age 12 to17 year-old teenage children showed that "81% of parents of online teens say they are concerned about how much information advertisers can learn about their child's online behavior, with some 46% being 'very' concerned."[162]

158.    A study comparing the opinions of young adults between the ages of 18 to 23 with other typical age categories (25-34, 35-44, 45-54, 55-64, and 65+) found that a large percentage is in harmony with older Americans regarding concerns about online privacy, norms, and policy suggestions.[163]  For example, 88% of young adults surveyed responded that "there should be a law that requires websites and advertising companies to delete all stored information about an individual"; for individuals in the 45-54 age range, 94% approved of such a law.

159.    The same study noted that "[o]ne way to judge a person's concern about privacy laws is to ask about the penalties that companies or individuals should pay for breaching them." A majority of the 18-24 year olds polled selected the highest dollar amount of punishment ("more than $2,500") in response to how a company should be fined if it purchases or uses someone's personal information illegally; across all age groups, 69% of individuals opted for the highest fine.  Finally, beyond a fine, around half of the sample (across all age groups) chose the harshest penalties for companies using a person's information illegally—putting them out of business and jail time.

160.    Another study's "findings suggest that if Americans could vote on behavioral targeting today, they would shut it down."  The study found that 66% of 1000 polled individuals over the age of 18 did not want online advertisements tailored for them, and that when the same individuals were told that tailored advertising was "based on following them on other websites they have visited," the percentage of respondent rejecting targeted advertising shot up to 84%.[164]

---

[162] Mary Madden, et al., *Parents, Teens, and Online Privacy*, Pew Research Center 2012, *available at* http://www.pewinternet.org/files/old-media//Files/Reports/2012/PIP_ParentsTeensAndPrivacy.pdf (accessed June 4, 2018).
[163] Chris Hoofnagle, et al., *How Different Are Young Adults from Older Adults When It Comes to Information Privacy Attitudes & Policies?*, 2010, *available at* http://ssrn.com/abstract=1589864 (accessed June 4, 2018).
[164] Joseph Turow, et al., *Contrary to What Marketers Say, Americans Reject Tailored Advertising*

1    161.   Even when consumers are told that online companies will follow them

2    "anonymously," Americans are still averse to this tracking:  68% definitely would not allow it,

3    and 19% would probably not allow it.

4    162.   The study found that 55% of 18-24 year old Americans rejected tailored

5    advertising when they were not informed about the mechanics of targeted advertising.  As with

6    the general sample, the percentage of rejections shot up to 67% when those 18-24 year olds were

7    informed that tailored advertising was based on their activities on the website they are visiting,

8    and then 86% when informed that tailored ads were based on tracking on "other websites" they

9    had visited.  Despite the overwhelming aversion to targeted advertising, these findings suggest

10   that public concern about privacy-intrusive targeted advertising is *understated* based on the fact

11   that the public may not fully understand how a targeted advertisement is delivered to it.  When

12   properly understood by consumers, targeted advertising, and the tracking and profiling in the

13   background, is decried across all age groups.

14   163.   A survey on consumer expectations in the digital world, conducted by Deloitte's

15   Technology, Media & Telecommunications practice[165] and based on polling conducted in 2017 of

16   2,088 individuals (from the following age groups: ages 14-20 (born 1997–2003); ages 21–34

17   (born 1983–1996); ages 35-51 (born 1966-1982); ages 52-70 (born 1947-1965); ages 71+ (born

18   1946 or earlier) found:

19         a.    73% of all U.S. consumers indicated they were concerned about sharing

20   their personal data online and the potential for identity theft.

21         b.    In 2017, there was a 10-point drop in willingness to share personal data in

22   exchange for personalized advertising (from 37% to 27%).

23         c.    The reason for the sudden change in U.S. consumers' attitudes is they

24   overwhelmingly lack confidence in companies' ability to protect their data:  69% of respondents

25   _____

26   *and Three Activities that Enable It* (2009), *available at* http://ssrn.com/abstract=1478214
     (accessed June 4, 2018).

27   [165] Kevin Westcott, et al., *Digital Media Trends Survey: A New World of Choice for Digital Consumers*, Center for Technology, Media & Telecommunications, 12th ed., *available at* https://www2.deloitte.com/content/dam/insights/us/articles/4479_Digital-media-trends/4479_Digital_media%20trends_Exec%20Sum_vFINAL.pdf (accessed June 4, 2018).

28

across generations believe that companies are not doing everything they can to protect consumers' personal data.

   d. 73% of all consumers across all generations said they would be more comfortable sharing their data if they had some visibility and control. In addition, 93% of U.S. consumers believe they should be able to delete their online data at their discretion.

  164. In the same vein, one news organization recently summarized a *Journal of Consumer Research* article, capturing society's discomfort with and feelings of revulsion toward the practice of targeted advertising and the data exfiltration required: "There's something unnatural about the kind of targeting that's become routine in the ad world, this paper suggests, something taboo, a violation of norms we consider inviolable — it's just harder to tell they're being violated online than off. But the revulsion we feel when we learn how we've been algorithmically targeted, the research suggests, is much the same as what we feel when our trust is betrayed in the analog world."[166]

  165. By collecting and sharing Plaintiffs' personal information in order to assist in profiling and tracking them across multiple online platforms, and failing to obtain Plaintiffs' permission, Defendants have breached Plaintiffs' expectations of privacy.

  166. Various other sources provide manifestations of society's deep revulsion toward companies' collecting personal information for tracking and profiling purposes:

   a. Legislative enactments reflect society's growing concern for digital privacy. For example, California's Shine the Light Law, Cal. Civ. Code § 1798.83, provides that companies that share a user's personal information with a third-party for direct marketing purposes must disclose to consumers, upon request, the category of personal information that is shared and the identities of the third-parties receiving the personal information. The California Online Privacy Protect Act of 2003, Cal. Bus. & Prof. Code § 22575, provides that an operator of an online service that collects "personally identifiable information" must provide notice in a

---

[166] Sam Biddle, "You Can't Handle the Truth about Facebook Ads, New Harvard Study Shows" The Intercept, May 9, 2018, *available at* https://theintercept.com/2018/05/09/facebook-ads-tracking-algorithm/?utm_source=digg&utm_medium=email (accessed on June 4, 2018).

public privacy policy to California consumers of, *inter alia*, any categories of such information collected and whether other parties may collect such information "overtime and across different Web sites" when a consumer uses the operator's service.

      b.     Scholarly literature about the evolution of privacy norms recognizes society's expectation of determining for oneself when, how, and the extent to which information about one is shared with others.

      c.     Self-regulation agencies in the online advertising industry note the American consumer's reasonable concern with online privacy (92% of Americans worry about their online data privacy) and the top causes of that concern include Defendants conduct at issue here: companies collecting and sharing personal information with other companies.[167]

### 2. Defendants Breach of Privacy Norms Is Compounded by Defendants' Targeting, Tracking, and Profiling of Children.

167.    Defendants' unlawful intrusion into Plaintiffs' privacy is made even more egregious and offensive by the fact that the Developer Defendants and their SDK partners have targeted and collected *children*'s information, without obtaining parental consent.

168.    Parents' interest in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by society.  The history of Western civilization reflects a strong tradition of parental concern for the nurture and upbringing of children in light of children's vulnerable predispositions.  Our society recognizes that parents should maintain control over who interacts with their children and how in order to ensure the safe and fair treatment of their children.

169.    Because children are more susceptible to deception and exploitation than adults, society has recognized the importance of providing added legal protections for children, often in the form of parental consent requirements.

170.    By way of example, American society has expressed heightened concern for the exploitation of children in numerous ways:

---

[167] "Data Privacy is a Major Concern for Consumers," TrustArc Blog, Jan. 28, 2015, *available at* https://www.trustarc.com/blog/2015/01/28/data-privacy-concern-consumers/ (accessed on June 4, 2018).

1          a.      At common law, children under the age of eighteen do not have full

2    capacity to enter into binding contracts with others.  The law shields minors from their lack of

3    judgment, cognitive development, and experience.

4          b.      Under state law, children are frequently protected via parental consent

5    requirements.  Cal. Civ. Code § 3344 requires "the prior consent of [a] parent or legal guardian"

6    in order for a person to use the name or likeness of a minor under the age of eighteen for

7    advertising purposes.  The California Education Code does not allow access to personal data

8    collected from students, without obtaining parental consent.  Cal. Educ. Code § 49076(a).

9    Various bills pending in California's State Congress seek to protect parental autonomy over

10   children engaged in online activities.

11         c.      State laws also outright ban certain forms of targeted advertising to

12   children. The California Student Online Personal Information Protection Act ("SOPIPA")

13   requires operators of mobile applications marketed for use in K-12 schools not engage in

14   "targeted advertising," "amass a profile" of children, or sell children's information, based upon

15   any information, including "persistent unique identifiers" (including geolocation), that the

16   operator acquires via the mobile app.

17         d.      The California Privacy Rights for California Minors in the Digital World

18   Act similarly reveals society's concern with the ability of sophisticated ad tech companies to

19   exploit minors under the age of eighteen through targeted advertising, and thus bans certain types

20   of targeted advertising.  The Act was passed in part as a response to the surreptitious manner in

21   which companies could exploit children's information:  "[w]eb sites and online advertising

22   networks often use persistent identification systems - like a cookie in a person's browser, the

23   unique serial number on a mobile phone, or the I.P. address of a computer - to collect information

24   about a user's online activities and tailor ads for that person."

25         e.      At the federal level, the Children's Online Privacy Protection Act

26   ("COPPA"), protects, *inter alia*, children's personal information from being collected and used

27   for targeted advertising purposes without parental consent, and reflects a clear nationwide norm

28

about parents' expectations to be involved in how companies profile and track their children online.

        f.      Under the federal Family Educational Rights and Privacy Act of 1974, students have a right of privacy regarding their school records, but the law grants parents a right to access and disclose such records. 20 U.S.C. § 1232g(a)(4).

171.    Legislative commentary about the need for federal law to provide protections for children provides another expression of society's expectation that companies should not track *children* online without obtaining parental consent.  For example, when discussing the need for federal legislation to protect children's privacy—which eventually led to Congress passing COPPA—Senator Richard Bryan (the primary author of the COPPA bill) stated:  "Parents do not always have the knowledge, the ability, or the opportunity to monitor their children's online activities, and that is why Web site operators should get parental consent prior to soliciting personal information.  The legislation that Senator McCain and I have introduced will *give parents the reassurance that when our children are on the Internet they will not be asked to give out personal information to commercial Web site operators without parental consent*."[168]

172.    The advertising industry's own privacy standards, and the self-regulatory agencies which serve it, also support enhanced protections for children online, including obtaining parental consent.

173.    For example, a survey of professionals in the advertising industry found that a "substantial majority of the respondents [advertising professionals] (79%) agrees that the collection of personal information of children should be prohibited," and over "[h]alf of the advertisers (56.8%) agrees with this statement if teenagers are concerned."[169]

174.    Further, "[t]he majority of advertisers agree with the statement that parents should give their permission for the data collection of their children (89.5%) and teenagers (78.9%)."

---

[168] *S. 2326: Children's Online Privacy Protection Act of 1998*, Hearing before Senate Subcommittee on Communications, S. Hrg. 105-1069, at 4 (Sept. 23, 1998) (Statement of Sen. Bryan) (emphasis added).

[169] Kristien Daems, Patrick De Pelsmacker & Ingrid Moons, *Advertisers' perceptions regarding the ethical appropriateness of new advertising formats aimed at minors*, J. Marketing Comms. 8 (2017).

175.    In the same vein, the Children's Advertising Review Unit, an arm of the advertising industry's self-regulation branch, recommends that companies take the following steps, *inter alia*, to meet consumers' reasonable expectations of privacy and avoid violating the law:[170]

a.        Advertisers have special responsibilities when advertising to children or collecting data from children online.  They should take into account the limited knowledge, experience, sophistication and maturity of the audience to which the message is directed.  They should recognize that younger children have a limited capacity to evaluate the credibility of information, may not understand the persuasive intent of advertising, and may not even understand that they are being subject to advertising.

b.        Operators should disclose passive means of collecting information from children (e.g., navigational tracking tools, browser files, persistent identifiers, etc.) and what information is being collected.

c.        Operators must obtain "verifiable parental consent" before they collect, use or disclose personal information to third-parties, except those who provide support for the internal operation of the website or online service and who do not use or disclose such information for any other purpose.

d.        To respect the privacy of parents, operators should not maintain in retrievable form information collected and used for the sole purpose of obtaining verifiable parental consent or providing notice to parents, if consent is not obtained after a reasonable time.

e.        Operators should ask screening questions in a neutral manner so as to discourage inaccurate answers from children trying to avoid parental permission requirements.

f.        Age-screening mechanisms should be used in conjunction with technology, e.g., a session cookie, to help prevent underage children from going back and changing their age to circumvent age-screening.

---

[170] Children's Advertising Review Unit, *Self-Regulatory Program for Children's Advertising* (2014), *available at* http://www.asrcreviews.org/wp-content/uploads/2012/04/Self-Regulatory-Program-for-Childrens-Advertising-Revised-2014-.pdf.

1    176.   By failing to (1) obtain parental consent, (2) disclose to parents the nature of their

2    data collection practices, and (3) take other steps to preclude children from accessing apps that

3    surreptitiously capture their personal information, Defendants have breached parents' and their

4    children's reasonable expectation of privacy, in contravention of privacy norms that are reflected

5    in consumer surveys, centuries of common law, state and federal statutes, legislative

6    commentaries, industry standards and guidelines, and scholarly literature.

7    **F.      Kiloo's Omissions and Misrepresentations Create the False Impression That
           Subway Surfers is Compliant with Privacy Laws and Social Norms.**

8

9    177.   Kiloo markets Subway Surfers as an app suitable for children, both explicitly

10   (through public-facing representations) and implicitly (through the game's content, design, and

11   distribution channels).

12   178.   However, despite doing so—and despite having indisputable knowledge that

13   children play on the app—Kiloo omits any mention of the privacy-invasive collection of personal

14   data by the SDKs embedded within the Subway Surfers app; and indeed makes affirmative

15   misrepresentations regarding the collection of children's personal data.

16   179.   Kiloo creates the false impression that Subway Surfers conforms to established

17   norms regarding children's privacy, and that Developer Defendants' and SDK Defendants'

18   behavior respect those norms.

19   **1.      Kiloo Markets Subway Surfers as Suitable to Children, and Is Aware
           That More Than Half of Its Audience is Younger than Age 18.**

20

21   180.   Subway Surfers is a gaming app whose subject matter, design, and distribution

22   mechanisms all suggest that the app is appropriate for children.  Subway Surfer users pretend to

23   be a "youthful hooligan" graffiti artist evading the police.  The app is marketed for kids age 9 and

24   older in the Apple App store and for kids age 10 and older in the Google Play Store.

25

26

27

28

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4344

1

181.    Below is a screenshot from the game:

2



3

4

5

6

7

8

9

10

11

12

13

14

15

16

182.    The design and game play of Subway Surfers, as well as how the app is positioned

in the marketplace, lead parents and industry groups to (properly) conclude that the app is

17

marketed towards children.  A 2015 statement from the Children's Advertising Review Unit

18

("CARU"), the advertising industry's self-regulating body that is a branch of the Better Business

19

Bureau, provides additional clarification:

20

21              The protagonist is a brightly colored cartoon character and is
               himself a "kid" and the game is basic in its play pattern.  The game
22             is featured as one of the "Games for Children" in the Android Store.
               It is rated for players age nine years and up in the Apple Store,
               players 10 years and up in the Google Play Store and for "All
23             Ages" by Amazon.  Parents posting to the website of Common
               Sense Media rated the game as appropriate for children age nine
24             and older, while children rated it appropriate for children age six or
               older.  The Australian Council on Children and the Media reviewed
25             Subway Surfer and provided special advice for parents relating to
               the game.[171]

26

27 [171] ASRC, "Following CARU Inquiry, App Maker Kiloo Agrees to Modify 'Subway Surfers'
   Privacy Policy to Better Protect Child Players," Oct. 28, 2015, *available at*
28 http://www.asrcreviews.org/following-caru-inquiry-app-maker-kiloo-agrees-to-modify-subway-

1    183.    In response to an inquiry from CARU as to the age of its audience, Kiloo supplied

2    user data indicating that more than fifty percent of those accessing Subway Surfer on iOS were

3    younger than 18 years of age.  *Id.*

4    184.    Kiloo and Sybo are therefore aware of Subway Surfers' immense popularity

5    among children, and they have sought to actively retain that youthful engagement.  For example,

6    in 2016, Sybo CEO stated in relation to a marketing event for children and their parents, "We

7    have just recently hosted a gigantic Subway Surfers Street party with several hundreds of children

8    and young people. The Subway Surfers universe is about expressing yourself, landing your next

9    trick and hanging out with your mates."[172]

10   185.    In the same vein, Kiloo's Director of Publishing said the following on the

11   inspiration for Subway Surfers design:  "[T]he entire style is very much centered around classic

12   Saturday morning cartoons with bright, vivid colors and a good dose of humor. There's also a

13   classic Tom and Jerry feel present in the game."[173]

14   186.    Similarly, Kiloo's website recruits children younger than age 18 to test its gaming

15   apps.[174]

16   187.    The Developer Defendants' age gating is also deceptive.  The mere presence of the

17   age gate conveys to the reasonable parent or child user that the Developer Defendants will abide

18   by social norms that require parental consent before conducting business with a minor.  The

19   Developer Defendants breaches reasonable expectations imparted in part by the appearance of

20   effective age gating which in fact is weak and ineffective.  The Developer Defendants' weak and

21   ineffective age gating deceptively encourages downloads and use of Subway Surfers.

22

23

24
_____

surfers-privacy-policy-to-better-protect-child-players/ (accessed on June 4, 2018).

25   [172] "Subway Surfers Street Party: Sybo Games," Eventive, *available at*
http://www.eventive.dk/cases/subway-surfers-street-party/ (accessed on June 4, 2018).

26   [173] Bernardo Español, "Kiloo / Subway Surfers Interview," Nardio, Sept. 12, 2012, *available at*
http://nardio.net/2012/09/12/kiloo-subway-surfers-interview/ (accessed on June 4, 2018).

27   [174] "Kiloo Playtester," Kiloo Jobs, *available* at http://www.kiloo.com/jobs/playtester/ (accessed
on June 4, 2018).

28

**2.      Kiloo Explicitly and Falsely Stated That It Does Not Track Children or Collect Personal Data.**

188.     CARU approached Kiloo regarding its data collection practices, in light of Subway Surfers' child audience.  Specifically, CARU sought clarification on whether Kiloo collected Personal Data of its child users.[175]  *Id.*  Kiloo represented—falsely—that it did *not* collect children's Personal Data: when CARU "requested data related to children 12 years of age and younger, Kiloo stated that it **did not have data relating to a younger audience**."[176]

189.     Thus, Kiloo does not simply deceive parents by *omitting* any mention of the data-exfiltrating SDK's contained within the Subway Surfers app (and of the attendant Personal Data of children that is acquired by the SDK Defendants and the Developer Defendants).  Kiloo has also specifically, and falsely, responded to CARU's 2015 inquiry by *affirmatively stating* that it does not collect personal data from children.

190.     Kiloo has deceived the public as to the data exfiltration functionality of the Subway Surfers app.  In so doing, it has created the false impression that Subway Surfers adheres to child privacy norms.

**3.      The SDK Defendants Violate Their Own Privacy Commitments.**

191.     As alleged herein, the SDK Defendants fail to comply with their own privacy commitments.  Each SDK Defendant posts an online policy that expressly disclaims that individual SDK's suitability for child-directed apps, or makes statements about complying with privacy laws and norms that have been proven false by forensic analysis. This applies to the SDKs' privacy policies in effect in 2017 when this litigation commenced as well as to those recently updated to comply with General Data Protection Regulation (or "GDPR") implemented in May 2018.[177]

---

[175] ASRC, "Following CARU Inquiry, App Maker Kiloo Agrees to Modify 'Subway Surfers' Privacy Policy to Better Protect Child Players," Oct. 28, 2015, *available at* http://www.asrcreviews.org/following-caru-inquiry-app-maker-kiloo-agrees-to-modify-subway-surfers-privacy-policy-to-better-protect-child-players/ (accessed on June 4, 2018).

[176] *Id.* (emphasis added).

[177] AdColony: https://www.adcolony.com/privacy-policy/; Chartboost: https://answers.chartboost.com/en-us/articles/200780269; Vungle: https://vungle.com/privacy/; ironSource: http://developers.ironsrc.com/ironsource-mobile/air/ironsource-mobile-privacy-policy/; Flurry/Oath: https://policies.oath.com/us/en/oath/privacy/index.html; Tapjoy:

G. **Fraudulent Concealment and Tolling.**

192.    The applicable statutes of limitations are tolled by virtue of Defendants' knowing and active concealment of the facts alleged above.  Plaintiffs and class members were ignorant of the information essential to the pursuit of these claims, without any fault or lack of diligence on their own part.

193.    At the time the action was filed, Defendants were under a duty to disclose the true character, quality, and nature of their activities to Plaintiffs and the classes.  Defendants are therefore estopped from relying on any statute of limitations.

194.    Defendants' fraudulent concealment is common to the classes.

H. **Named Plaintiff Allegations.**

1. **Plaintiff Michael McDonald and His Children, P.G.M., P.S.M., and P.R.M.**

195.    In or around 2014 or 2015, Mr. McDonald or his children downloaded Subway Surfers onto mobile devices in order for his children, P.G.M., P.S.M., and P.R.M., to play the game.  P.G.M., P.S.M., and P.R.M. thereafter frequently played Subway Surfers on these devices on an ongoing and continuous basis.

196.    During the time P.G.M., P.S.M., and P.R.M. played Subway Surfers, the Developer Defendants partnered with each of the SDK Defendants to collect the Personal Data of P.G.M., P.S.M., and P.R.M for the purposes of tracking, profiling, and targeting them.

197.    Prior to the forensic investigation conducted for this action, Mr. McDonald, P.G.M., P.S.M., and P.R.M. were not aware of the existence of any of the SDK Defendants, did not know that Kiloo had embedded the SDK Defendants' code in the version of the Subway Surfer app the children were playing, and did not know the Defendants were exfiltrating the children's Personal Data as they played Subway Surfers to track, profile, and target her.

198.    Defendants' tracking, profiling and targeting of P.G.M, P.S.M and P.R.M without parental consent is highly offensive to Mr. McDonald and constitutes an invasion of his children's privacy and of Mr. McDonald's right to protect his children from this invasion.

https://www.tapjoy.com/legal/#privacy-policy; InMobi: https://www.InMobi.com/coppa-terms/.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4344

**2.     Plaintiff Tamara Draut and Her Child, H.D.-F.**

199.    In 2015 or 2016, Ms. Draut or her child downloaded Subway Surfers onto mobile devices in order for H.D.-F. to play the game.  H.D.-F. thereafter frequently played Subway Surfers on this device on an ongoing and continuous basis.

200.    During the time H.D.-F. played Subway Surfers on the device, the Developer Defendants partnered with each of the SDK Defendants to collect the Personal Data of H.D.-F. for the purposes of tracking, profiling, and targeting them.

201.    Prior to the forensic investigation conducted for this action, Ms. Draut and H.D.-F. were not aware of the existence of any of the SDK Defendants, did not know that Kiloo had embedded the SDK Defendants' code in the version of the Subway Surfers app H.D.-F. was playing, and did not know the Defendants were exfiltrating H.D.-F.'s Personal Data as she played Subway Surfers to track, profile, and target her.

202.    Defendants' tracking, profiling, and targeting of H.D.-F.'s personal information without Ms. Draut's consent is highly offensive to Ms. Draut and constitutes an invasion of her child's privacy and of Ms. Draut's right to protect her child from this invasion.

**3.     Plaintiff Dominique Murillo and Her Children, M.M., G.M., and E.M.**

203.    In or around 2014 or 2015, Ms. Murillo or her children downloaded Subway Surfers onto mobile devices in order for M.M., G.M., and E.M., to play the game.  M.M., G.M., and E.M. thereafter frequently played Subway Surfers on these devices on an ongoing and continuous basis.

204.    During the time M.M., G.M., and E.M. played Subway Surfers, the Developer Defendants contracted with each of the SDK Defendants to collect the personal data of M.M., G.M., and E.M. for the purposes of tracking, profiling, and targeting them.

205.    Prior to the forensic investigation conducted for this action, Ms. Murillo, M.M., G.M., and E.M. were not aware of the existence of any of the SDK Defendants, did not know that Kiloo had embedded the SDK Defendants' code in the version of the Subway Surfer app the children were playing, and did not know the Defendants were exfiltrating the children's personal data as they played Subway Surfers to track, profile, and target them.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4344

206.    Defendants' tracking, profiling and targeting of M.M., G.M., and E.M. without parental consent is highly offensive to Ms. Murillo and constitutes an invasion of her children's privacy and of Ms. Murillo's right to protect her children from this invasion.

## VI.    CLASS ALLEGATIONS

207.    Plaintiffs seek class certification of the classes and subclass set forth herein pursuant to Federal Rule of Civil Procedure 23.

208.    Plaintiffs seek class certification of claims under California law for the common law privacy cause of action "Intrusion Upon Seclusion," on behalf of a class defined as follows:

> **The Intrusion Upon Seclusion Class:**  all parents and/or legal guardians of persons residing in the States of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Minnesota, Missouri, Nevada, New Hampshire, New Jersey, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South  Dakota, Texas, Utah, Vermont, Washington, and West Virginia who are younger than the age of 18, or were younger than the age of 18 when they played Subway Surfers, and from whom Defendants collected, used, or disclosed Personal Data.

209.    Plaintiff Michael McDonald, on behalf of himself and as parent and guardian of his children, P.G.M, P.S.M., and P.R.M, and Plaintiff Dominique Murillo, on behalf of herself and as parent and guardian of her children, M.M., G.M., and E.M., are the proposed Class Representatives for the Intrusion Upon Seclusion Class.

210.    Plaintiffs seek class certification of a claim for violation of the State of California Constitution Right to Privacy on behalf of a subclass of the Intrusion Upon Seclusion Class defined as follows:

> **The California Subclass:**  all parents and/or legal guardians of persons residing in the State of California who are younger than the age of 18, or were younger than the age of 18 when they played Subway Surfers, and from whom Defendants collected, used, or disclosed Personal Data.

211.    Plaintiff Michael McDonald, on behalf of himself and as parent and guardian of his children, P.G.M, P.S.M., and P.R.M., and Plaintiff Dominique Murillo, on behalf of herself and as parent and guardian of her children, M.M., G.M., and E.M., are the proposed Class Representatives for the California Subclass.

212.     Plaintiffs seek class certification of a claim for violation of the State of New York General Business Law § 349 on behalf of a class defined as follows:

> **The New York Class:**  all parents and/or legal guardians of persons residing in the State of New York who are younger than the age of 18, or were younger than the age of 18 when they played Subway Surfers, and from whom Defendants collected, used, or disclosed Personal Data.

213.     Plaintiff Tamara Draut, on behalf of herself and as parent and guardian of her child, H.D.-F., is the proposed Class Representative for the New York Class.

214.     Plaintiffs reserve the right to modify or refine the Class or Subclass definitions based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

215.     Excluded from the Classes and Subclass are:  (a) any Judge or Magistrate Judge presiding over this action and members of their staff, as well as members of their families; (b) Defendants, Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Classes or Subclass; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

216.     **Ascertainability.**  The proposed Classes and Subclass are readily ascertainable because they are defined using objective criteria so as to allow class members to determine if they are part of a Class or Subclass.  Further, the Classes and Subclass can be readily identified through records maintained by Defendants.

217.     **Numerosity (Rule 23(a)(1)).**  The Classes and Subclass are so numerous that joinder of individual members herein is impracticable.  The exact number of Class or Subclass

members, as herein identified and described, is not known, but download figures indicate that the Subway Surfers has been downloaded more than a billion times.[178]

218.    **Commonality (Rule 23(a)(2)).**  Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class and Subclass members, including the following:

i.      Whether Developer Defendants engaged in the activities referenced in paragraphs 40 to 106 via Subway Surfers;

ii.     Whether the SDK Defendants engaged in the activities referenced in paragraphs 40 to 106 via Subway Surfers;

iii.    Whether Defendants' acts and practices complained of herein amount to acts of intrusion upon seclusion under the law of California;

iv.     Whether Defendants' conduct violated Subclass members' California constitutional Right to Privacy;

v.      Whether Defendants' acts and practices complained of herein violate New York General Business Law § 349;

vi.     Whether members of the Classes and Subclass have sustained damages, and, if so, in what amount; and

vii.    What is the appropriate injunctive relief to ensure Defendants no longer illegally collect children's personal information to track, profile, and target them over time and across different websites or online services.

219.    **Typicality (Rule 23(a)(3)).**  Plaintiffs' claims are typical of the claims of members of the proposed Classes and Subclass because, among other things, Plaintiffs and members of the Classes and Subclass sustained similar injuries as a result of Defendants' uniform wrongful conduct and their legal claims all arise from the same events and wrongful conduct by Defendants.

---

[178] *See* n.2, *infra.*

220.   **Adequacy (Rule 23(a)(4)).**  Plaintiffs will fairly and adequately protect the interests of the proposed Classes and Subclass.  Plaintiffs' interests do not conflict with the interests of the Classes and Subclass members and Plaintiffs have retained counsel experienced in complex class action and data privacy litigation to prosecute this case on behalf of the Classes and Subclass.

221.   **Predominance & Superiority (Rule 23(b)(3)).**  In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3).  Common questions of law and fact predominate over any questions affecting only individual Class and Subclass members, and a class action is superior to individual litigation and all other available methods for the fair and efficient adjudication of this controversy.  The amount of damages available to individual Plaintiffs is insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedure.  Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense presented by the complex legal and factual issues of the case to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

222.   **Final Declaratory or Injunctive Relief (Rule 23(b)(2)).**  Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(b)(2).  Defendants have acted or refused to act on grounds that apply generally to the proposed Classes and Subclass, making final declaratory or injunctive relief appropriate with respect to the proposed Classes and Subclass as a whole.

223.   **Particular Issues (Rule 23(c)(4)).**  Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4).  Their claims consist of particular issues that are common to all Class and Subclass members and are capable of class-wide resolution that will significantly advance the litigation.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4344

1    **VII.    <u>CLAIMS FOR RELIEF</u>**

2                                    **COUNT I**
                              **Intrusion Upon Seclusion**
3              **(Brought on Behalf of the Intrusion Upon Seclusion Class)**

4          224.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

5          225.    California law on intrusion upon seclusion is applicable for all members of the

6    Intrusion Upon Seclusion Class because there is no conflict of law between the law in California

7    and any of the states in which the Class members reside.  The jurisprudence in California and

8    each of the relevant states adheres to Restatement (Second) of Torts, § 652B with no material

9    variation.  Accordingly, because the law on intrusion upon seclusion in each of the states where

10   the Class members reside does not materially differ from the law of the forum state of California,

11   the law of California applies for adjudication of all members of the Class.

12         226.    "One who intentionally intrudes, physically or otherwise, upon the solitude or

13   seclusion of another or his private affairs or concerns, is subject to liability to the other for

14   invasion of his privacy, if the intrusion would be highly offensive to a reasonable person."

15   Restatement (Second) of Torts, § 652B.

16         227.    Plaintiff Michael McDonald, and his children, P.G.M, P.S.M., and P.R.M, and

17   Plaintiff Dominique Murillo, and her children M.M., G.M., and E.M., and Class members have

18   reasonable expectations of privacy in their mobile devices and their online behavior, generally.

19   Plaintiffs' and Class members' private affairs include their behavior on their mobile devices as

20   well as any other behavior that may be monitored by the surreptitious tracking employed or

21   otherwise enabled by Subway Surfers.

22         228.    The reasonableness of such expectations of privacy is supported by Developer

23   Defendants' unique position to monitor Plaintiffs' and Class members' behavior through their

24   access to Plaintiffs' and Class members' private mobile devices.  It is further supported by the

25   surreptitious, highly-technical, and non-intuitive nature of Defendants' tracking.

26         229.    Defendants intentionally intruded on and into Plaintiffs' and Class members'

27   solitude, seclusion, or private affairs by intentionally designing Subway Surfers (as well as all

28   SDKs identified in this Complaint) to surreptitiously obtain, improperly gain knowledge of,

                                          - 74 -

1   review, and/or retain Plaintiffs' and Class members' activities through the monitoring

2   technologies and activities described herein.

3          230.   These intrusions are highly offensive to a reasonable person.  This is evidenced by,

4   *inter alia*, countless consumer surveys, studies, and op-eds decrying the online tracking of

5   children, centuries of common law, state and federal statutes and regulations, legislative

6   commentaries, enforcement actions undertaken by the FTC, industry standards and guidelines,

7   and scholarly literature on consumers' reasonable expectations.  Further, the extent of the

8   intrusion cannot be fully known, as the nature of privacy invasion involves sharing Plaintiffs' and

9   Class members' personal information with potentially countless third-parties, known and

10  unknown, for undisclosed and potentially unknowable purposes, in perpetuity.  Also supporting

11  the highly offensive nature of Defendants' conduct is the fact that Defendants' principal goal was

12  to surreptitiously monitor Plaintiffs and Class members—in one of the most private spaces

13  available to an individual in modern life—and to allow third-parties to do the same.

14         231.   Defendants' intrusion into the sacrosanct relationship between parent and child

15  and subsequent commercial exploitation of children's special vulnerabilities online also

16  contributes to the highly offensive nature of Defendants' activities.

17         232.   Plaintiffs and Class members were harmed by the intrusion into their private

18  affairs as detailed throughout this Complaint.

19         233.   Defendants' actions and conduct complained of herein were a substantial factor in

20  causing the harm suffered by Plaintiffs and Class members.

21         234.   As a result of Defendants' actions, Plaintiffs and Class members seek injunctive

22  relief, in the form of Defendants' cessation of tracking practices in violation of state law, and

23  destruction of all personal data obtained in violation of state law.

24         235.   As a result of Defendants' actions, Plaintiffs and Class members seek nominal and

25  punitive damages in an amount to be determined at trial.  Plaintiffs and Class members seek

26  punitive damages because Defendants' actions—which were malicious, oppressive, willful—

27  were calculated to injure Plaintiffs and made in conscious disregard of Plaintiffs' rights.  Punitive

28  damages are warranted to deter Defendants from engaging in future misconduct.

236. Plaintiffs seek restitution for the unjust enrichment obtained by Defendants as a result of unlawfully collecting Plaintiffs' personal data. These intrusions are highly offensive to a reasonable person. This is evidenced by, *inter alia*, the legislation enacted by Congress, rules promulgated and enforcement actions undertaken by the FTC, and countless studies, op-eds, and articles decrying the online tracking of children. Further, the extent of the intrusion cannot be fully known, as the nature of privacy invasion involves sharing Plaintiffs' and Class members' personal information with potentially countless third-parties, known and unknown, for undisclosed and potentially unknowable purposes, in perpetuity. Also supporting the highly offensive nature of Defendants' conduct is the fact that Defendants' principal goal was to surreptitiously monitor Plaintiffs and Class members—in one of the most private spaces available to an individual in modern life—and to allow third-parties to do the same.

**COUNT II**
**California Constitutional Right to Privacy**
**(Brought on Behalf of the California Subclass of the Intrusion Upon Seclusion Class)**

237. Plaintiffs repeat and reallege all preceding paragraphs contained herein.

238. Plaintiff Michael McDonald, and his children, P.G.M, P.S.M., and P.R.M; Plaintiff Dominique Murillo, and her children M.M., G.M., and E.M.; and Subclass members have reasonable expectations of privacy in their mobile devices and their online behavior, generally. Plaintiffs' and Subclass members' private affairs include their behavior on their mobile devices as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Subway Surfers.

239. The reasonableness of such expectations of privacy is supported by Developer Defendants' unique position to monitor Plaintiffs' and Subclass members' behavior through their access to Plaintiffs' and Subclass members' private mobile devices. It is further supported by the surreptitious, highly-technical, and non-intuitive nature of Defendants' tracking.

240. Defendants intentionally intruded on and into Plaintiffs' and Subclass members' solitude, seclusion, right of privacy, or private affairs by intentionally designing Subway Surfers (as well as all SDKs identified in this Complaint) to surreptitiously obtain, improperly gain

1    knowledge of, review, and/or retain Plaintiffs' and Subclass members' activities through the

2    monitoring technologies and activities described herein.

3           241.    These intrusions are highly offensive to a reasonable person, because they

4    disclosed sensitive and confidential information about children, constituting an egregious breach

5    of social norms.  This is evidenced by, *inter alia*, countless consumer surveys, studies, and op-eds

6    decrying the online tracking of children, centuries of common law, state and federal statutes and

7    regulations, legislative commentaries, enforcement actions undertaken by the FTC, industry

8    standards and guidelines, and scholarly literature on consumers' reasonable expectations.

9    Further, the extent of the intrusion cannot be fully known, as the nature of privacy invasion

10    involves sharing Plaintiffs' and Subclass members' personal information with potentially

11    countless third-parties, known and unknown, for undisclosed and potentially unknowable

12    purposes, in perpetuity.  Also supporting the highly offensive nature of Defendants' conduct is

13    the fact that Defendants' principal goal was to surreptitiously monitor Plaintiffs and Subclass

14    members—in one of the most private spaces available to an individual in modern life—and to

15    allow third-parties to do the same.

16           242.    Defendants' intrusion into the sacred relationship between parent and child and

17    subsequent commercial exploitation of children's special vulnerabilities online also contributes to

18    the highly offensive nature of Defendants' activities.

19           243.    Plaintiffs and Subclass members were harmed by the intrusion into their private

20    affairs as detailed throughout this Complaint.

21           244.    Defendants' actions and conduct complained of herein were a substantial factor in

22    causing the harm suffered by Plaintiffs and Subclass members.

23           245.    As a result of Defendants' actions, Plaintiffs and Subclass members seek

24    injunctive relief, in the form of Defendants' cessation of tracking practices in violation of state

25    law, and destruction of all personal data obtained in violation of state law.

26           246.    As a result of Defendants' actions, Plaintiffs and Subclass members seek nominal

27    and punitive damages in an amount to be determined at trial.  Plaintiffs and Class members seek

28    punitive damages because Defendants' actions—which were malicious, oppressive, willful—

1   were calculated to injure Plaintiffs and made in conscious disregard of Plaintiffs' rights. Punitive

2   damages are warranted to deter Defendants from engaging in future misconduct.

3                                      **COUNT III**
                              **Violation of N.Y. Gen. Bus. Law § 349**
4                           **(Brought on Behalf of the New York Class)**

5        247.   Plaintiffs repeat and reallege all preceding paragraphs contained herein.

6        248.   Plaintiff Tamara Draut and her child, H.D.-F and Class members are "persons"

7   within the meaning of New York General Business Law § 349(h).

8        249.   Each Defendant is a "person," "firm," "corporation," or "association" within the

9   meaning of N.Y. Gen. Bus. Law § 349.

10       250.   Section 349 makes unlawful "[d]eceptive acts or practices in the conduct of any

11  business, trade or commerce."

12       251.   Defendants' conduct constitutes "deceptive acts or practices" within the meaning

13  of N.Y. Gen. Bus. Law § 349. Defendants surreptitiously tracked children without disclosing

14  their activities to their parents, in violation of applicable laws and reasonable expectations of

15  privacy.

16       252.   Defendants' conduct occurred in the conduct of trade or commerce, and was

17  directed at consumers.

18       253.   Defendants' conduct was misleading in a material way, because, *inter alia*,

19  Defendants used Subway Surfers as a vehicle for secretly and intentionally tracking and profiling

20  child users, over time and across different online platforms, without providing notice or obtaining

21  consent. As a result, parents are denied the opportunity to make informed decisions on whether

22  to permit Defendants to exfiltrate their children's Personal Data and share it with third-parties for

23  commercial and other undisclosed purposes. Given the entirely surreptitious and intentional

24  nature of the tracking technology at play, and Defendants exclusive knowledge of it, Defendants

25  had a duty to disclose the nature of their conduct. Defendants were also obligated to obtain

26  parental consent before tracking and exfiltrating children's Personal Data. By failing to disclose

27  its ability to track child users who play Subway Surfers, Defendants purposely misled Class

28  members.

254.    As detailed in the allegations in Section V.A.-B., unlike aggregated or anonymized data, the Personal Data collected and used by each of the Defendants is identifiable or associable with specific, individual child users, is as persistent as a social security number, and can be used to track, profile, and target children across multiple devices and over time.

255.    As a result of Defendants' deceptive acts and practices, Plaintiffs and Class members were injured and damaged in that they suffered a loss of privacy and autonomy through Defendants' acquisition and use of children's personal information, for Defendants' own benefit, without the Class members' knowledge or verifiable parental consent.

256.    Because Defendants' willful and knowing conduct caused injury to Plaintiffs and Class members, the Class seeks recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive conduct, and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.  Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiff and made in conscious disregard of Plaintiff's rights.  Punitive damages are warranted to deter Defendants from engaging in future misconduct.

## VIII.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

a.    Certify this case as a class action, appoint Plaintiffs as Class and Subclass representatives, and appoint Plaintiffs' counsel to represent the Classes and Subclass;

b.    Find that Defendants' actions, as described herein, constitute: (i) violations of New York General Business Law § 349, (ii) breaches of the common law claim of intrusion upon seclusion under the law of the State of California and as to the Intrusion Upon Seclusion Class; and (3) a violation of the right to privacy under California Constitution, Article I, Section 1;

1          c.    Award Plaintiffs and Class and Subclass members appropriate relief,

2    including actual, nominal, and/or statutory damages and punitive damages, in an amount to be

3    determined at trial;

4          d.    Award restitution to Plaintiffs and Class and Subclass members for

5    Defendants' unjust enrichment;

6          e.    Award equitable, injunctive, and declaratory relief as may be appropriate;

7          f.    Award all costs, including experts' fees, attorneys' fees, and the costs of

8    prosecuting this action; and

9          g.    Grant such other legal and equitable relief as the Court may deem

10   appropriate.

11   Dated: June 4, 2018                    Respectfully Submitted,

12                                          /s/ _____

13                                          Michael W. Sobol (State Bar No. 194857)
                                            msobol@lchb.com
14                                          Facundo Bouzat (State Bar No. 316957)
                                            fbouzat@lchb.com
15                                          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                            275 Battery Street, 29th Floor
16                                          San Francisco, CA  94111-3339
                                            Telephone:  415.956.1000
17                                          Facsimile:  415.956.1008

18                                          Nicholas Diamand (admitted *Pro Hac Vice*)
                                            ndiamand@lchb.com
19                                          Douglas I. Cuthbertson (admitted *Pro Hac Vice*)
                                            dcuthbertson@lchb.com
20                                          Abbye R. Klamann (State Bar No. 311112)
                                            aklamann@lchb.com
21                                          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                            250 Hudson Street, 8th Floor
22                                          New York, NY  10013-1413
                                            Telephone:  212.355.9500
23                                          Facsimile:  212.355.9592

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Hank Bates (State Bar No. 167688)
hbates@cbplaw.com
Allen Carney (admitted *Pro Hac Vice*)
acarney@cbplaw.com
David Slade (admitted *Pro Hac Vice*)
dslade@cbplaw.com
CARNEY BATES & PULLIAM, PLLC
519 W. 7th St.
Little Rock, AR 72201
Telephone:  501.312.8500
Facsimile:  501.312.8505

*Attorneys for Plaintiffs and the proposed Classes*

AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:17-CV-4344

1

2 ## **DEMAND FOR JURY TRIAL**

3        Plaintiffs hereby demand a trial by jury of all issues so triable.

4 Dated: June 4, 2018                          Respectfully Submitted,

5                                              /s/

6                                              Michael W. Sobol (State Bar No. 194857)
                                               msobol@lchb.com
7                                              Facundo Bouzat (State Bar No. 316957)
                                               fbouzat@lchb.com
8                                              LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                               275 Battery Street, 29th Floor
9                                              San Francisco, CA  94111-3339
                                               Telephone:  415.956.1000
10                                             Facsimile:  415.956.1008

11                                             Nicholas Diamand (admitted *Pro Hac Vice*)
                                               ndiamand@lchb.com
12                                             Douglas I. Cuthbertson (admitted *Pro Hac Vice*)
                                               dcuthbertson@lchb.com
13                                             Abbye R. Klamann (State Bar No. 31112)
                                               aklamann@lchb.com
14                                             LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                               250 Hudson Street, 8th Floor
15                                             New York, NY  10013-1413
                                               Telephone:  212.355.9500
16                                             Facsimile:  212.355.9592

17                                             Hank Bates (State Bar No. 167688)
                                               hbates@cbplaw.com
18                                             Allen Carney (admitted *Pro Hac Vice*)
                                               acarney@cbplaw.com
19                                             David Slade (admitted *Pro Hac Vice*)
                                               dslade@cbplaw.com
20                                             CARNEY BATES & PULLIAM, PLLC
                                               519 W. 7th St.
21                                             Little Rock, AR 72201
                                               Telephone:  501.312.8500
22                                             Facsimile:  501.312.8505

23                                             *Attorneys for Plaintiffs and the Proposed Classes*

24

25

26

27

28

AMENDED CLASS ACTION COMPLAINT
                                                                     CASE NO. 3:17-CV-4344